**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RUSSELL LEE GILLOGLY,

      Plaintiff - Appellee/Cross -
      Appellant,

v.

GENERAL ELECTRIC CAPITAL
ASSURANCE COMPANY, aka GE
Capital Assurance, aka GE Financial
Assurance Holdings, Inc.,

      Defendant - Appellant/Cross -
      Appellee.

Nos. 04-7026, 04-7032, 04-7042

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 02-CV-658)**

---

John T. Edwards and Shannon L. Edwards, Monnet, Hayes, Bullis, Thompson &
Edwards, Oklahoma City, Oklahoma; Reid L. Ashinoff, Michael S. Gugig, and
Joshua S. Akbar, Sonnenschein Nath & Rosenthal LLP, New York, New York;
and James M. Sturdivant and Timothy A. Carney, Cable & Gotwals, Tulsa,
Oklahoma, for Defendant-Appellant/Cross-Appellee.

W.G. Gil Steidley, Jr., Michelle Harris, and Keri G. Williams, Steidley & Neal,
Tulsa, Oklahoma; and Charles D. Neal, Jr., Steidley & Neal, McAlester,
Oklahoma, for Plaintiff-Appellee/Cross-Appellant.

---

Before **EBEL**, Circuit Judge, **McWILLIAMS,** Senior Circuit Judge, and **KELLY**, Circuit Judge.

---

**EBEL**, Circuit Judge.

---

In these appeals, we interpret a long term care insurance policy that Plaintiff Russell Lee Gillogly ("Gillogly") purchased from a predecessor to Defendant insurer General Electric Capital Assurance Company ("GECA").[1] We REVERSE the district court's grant of summary judgment for Gillogly on his claim that GECA breached its contract with Gillogly when it denied his request for benefits under the policy. We also REVERSE the district court's entry of judgment in favor of Gillogly on his claim that GECA denied his request for benefits in bad faith. Finally, we AFFIRM the district court's entry of judgment as a matter of law for GECA on Gillogly's claim for punitive damages. Therefore, we REMAND the case to the district court with instructions to enter judgment for GECA on Gillogly's claims that GECA breached its contract with Gillogly and acted in bad faith.

---

[1]After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of appeal numbers 04-7026 and 04-7032. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). Those cases are therefore ordered submitted without oral argument.

# BACKGROUND

In 1989 Gillogly purchased a "Long Term Care Insurance Nursing Home Indemnity Policy" ("Policy") from AMEX Life Assurance Company. As a result of a 1996 merger, GECA assumed all of AMEX Life Assurance Company's rights and obligations under the Policy.

The Policy provides a "Nursing Home Benefit"—a fixed daily benefit of $60 per day for an inpatient stay in a nursing home for up to 730 days after a deductible period of 100 days is reached. Specifically, the Policy states:

> We will pay the Daily Benefit for each Day Of A Nursing Home Stay After the Deductible Period, if:
>
> •      the Policy is in force when the Nursing Home stay starts; and
>
> •      You are confined in the Nursing Home as an overnight resident patient and a room and board charge is made for that day; and
>
> •      Your Nursing Home Stay is Necessary . . . .
>
> Your Nursing Home Stay Is Necessary as long as: (1) a Doctor certifies that Your admission is required due to injury or sickness; and (2) there exists a level of functional incapacity which makes your continued Nursing Home stay appropriate and reasonable.
>
> This Policy makes no distinction, in the duration or amount of benefits You will be paid, for different levels of care (whether skilled, intermediate, or custodial) as long as Your Nursing Home Stay Is Necessary.

The Policy defines a "Nursing Home" as:

A facility or distinctly separate part of a hospital or other institution which is licensed by the appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients and:

- Provides 24 hour a day nursing service under a planned program of policies and procedures which was developed with the advice of, and is periodically reviewed and executed by, a professional group of at least one physician and one Nurse; and

- Has a Doctor available . . . in case of emergency; and

- Has at least one Nurse who is employed there full time . . . ; and

- Has a Nurse on duty or on call at all times; and

- Maintains clinical records for all patients; and

- Has appropriate methods and procedures for handling and administering drugs and biologicals.

NOTE: The above requirements are typically met by licensed skilled nursing facilities, comprehensive nursing care facilities and intermediate nursing care facilities as well as some specialized wards, wings and units of hospitals. Those requirements are generally NOT met by: rest homes; homes for the aged; sheltered living accommodations; residence homes; or similar living arrangements.

The Policy does not define the term "nursing care and related services" used in the first part of the Policy's definition of "Nursing Home."

In 2001 Gillogly began residing at the Van Buren House ("VBH") of the McAlester Regional Health Center ("MRHC") in Oklahoma. Gillogly thereafter sought benefits from GECA under the Policy to pay for his stay at VBH. GECA

- 4 -

declined to award benefits because GECA believed that VBH did not qualify as a

"Nursing Home" under the Policy, stating in a letter to Gillogly that:

> The referenced policy is a basic Nursing Home Indemnity Policy. It provides neither alternative care facility nor home health care benefits. Its principal focus is to indemnify stays in care facilities that satisfy the policy definition of a Nursing Home.
>
> The term Nursing Home is defined in the policy as a facility licensed by the appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients. The policy also requires the facility to provide certain services; these are listed in a bulleted format.
>
> . . . [T]he information submitted from the Van Buren House . . . reflected they are not licensed by the appropriate licensing agency to engage primarily in providing nursing care. In fact, the care facility holds a license issued by the Oklahoma Department of Health to function as a Residential Care Home.
>
> . . . The state of Oklahoma has provided a Residential Care Home license in order to allow the care facility in question to provide personal care services only.

Gillogly filed suit against GECA in the United States District Court for the

Eastern District of Oklahoma, alleging that GECA had breached its contract and

the covenant of good faith and fair dealing in denying his request for benefits

under the Policy.[2] Gillogly sought both compensatory and punitive damages.

---

[2]Oklahoma recognizes a cause of action in tort for an insurance company's bad faith refusal to pay a valid insurance claim. See Christian v. Am. Home Assurance Co., 577 P.2d 899, 904 (Okla. 1977).

GECA filed a motion for summary judgment, arguing that it had neither breached its contract with Gillogly nor acted in bad faith in denying Gillogly's request for benefits. Gillogly filed a motion for partial summary judgment, seeking to establish that GECA was liable for breach of contract. The district court denied GECA's motion and granted Gillogly's motion, holding that GECA was liable for breach of contract. However, because damages for the breach had not been determined, the court did not enter judgment on the claim.

The parties proceeded to a jury trial on Gillogly's claim that GECA had acted in bad faith in denying his request for benefits. At the close of all the evidence, the district court determined as a matter of law that GECA had acted in bad faith. The court also granted judgment as a matter of law to GECA on Gillogly's claim for punitive damages. The jury then determined Gillogly's actual damages on the claim that GECA had acted in bad faith to be $4 million. The district court entered judgment on that claim on January 12, 2004.

On March 15, 2004, fourteen days after the district court rejected GECA's post-judgment motion for judgment as a matter of law, a new trial, or remittitur of the jury verdict, GECA filed a notice of appeal. In that notice, GECA asserted that it would contest the district court's entry of judgment on Gillogly's claim that GECA had acted in bad faith, as well as the district court's denial of GECA's post-judgment motion. Gillogly filed a notice of appeal on March 19, 2004,

appealing the district court's order granting GECA judgment as a matter of law on his punitive damages claim.

On April 14, 2004, the district court entered judgment on Gillogly's breach of contract claim, awarding Gillogly damages in an amount to which the parties had stipulated.[3] GECA filed a second notice of appeal on May 3, 2004, this time challenging the district court's order granting summary judgment to Gillogly on his breach of contract claim.

## DISCUSSION

### I.      Jurisdiction and Standard of Review

We exercise jurisdiction over these appeals pursuant to 28 U.S.C. § 1291,[4] reviewing de novo the district court's rulings on the parties' motions for summary judgment and a directed verdict. See Welding v. Bios Corp., 353 F.3d 1214, 1217 (10th Cir. 2004); Strickland Tower Maintenance, Inc. v. AT&T Commc'ns, Inc.,

_____

[3]In addition to $80,601 for breach of contract, the district court awarded Gillogly $750,000 for costs, attorney's fees, and pre-judgment interest.

[4]When the parties filed the first two notices of appeal, the district court's judgment was not yet final because damages for the breach of contract claim had not been determined and a judgment on that claim had not been entered. See Fed. R. Civ. P. 54(b); Albright v. UNUM Life Ins. Co., 59 F.3d 1089, 1092 (10th Cir. 1995). However, those notices of appeal became valid when the district court entered judgment on Gillogly's breach of contract claim on April 14, 2004, because the court's January 12 and April 14 judgments together constitute a final judgment. See Lewis v. B.F. Goodrich Co., 850 F.2d 641, 644-46 (10th Cir. 1988) (en banc). The two judgments, along with the court's orders addressing the parties' summary judgment motions and GECA's post-judgment motion, dispose of all claims by and against all parties in the proceedings.

128 F.3d 1422, 1426 (10th Cir. 1997). Summary judgment is appropriate when the pleadings, deposition transcripts, affidavits and evidentiary material show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Welding, 353 F.3d at 1217. A party can obtain judgment as a matter of law in its favor "only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." Conoco Inc. v. ONEOK, Inc., 91 F.3d 1405, 1407 (10th Cir. 1996) (quotations omitted).

## II. Breach of Contract

### A. Legal Framework

Under the substantive law of the State of Oklahoma, which we apply in this diversity case, see C.F. Braun & Co. v. Okla. Gas & Elec. Co., 603 F.2d 132, 133 n.1 (10th Cir. 1979):

> [p]arties to [an] insurance contract . . . are bound by [the] terms of [the] contract and courts will not undertake to rewrite [the] terms thereof. The construction of an insurance policy should be a natural and reasonable one, fairly construed to effectuate its purpose, and viewed in the light of common sense so as not to bring about an absurd result. . . . A policy of insurance is a contract and should be construed as every other contract, that is, where not ambiguous, according to its terms.

Wiley v. Travelers Ins. Co., 534 P.2d 1293, 1295-96 (Okla. 1974). Thus, if a reasonably prudent lay person would find that a term used in a policy is not susceptible to two interpretations on its face, see Cranfill v. Aetna Life Ins. Co.,

- 8 -

49 P.3d 703, 706 (Okla. 2002), the intent of the parties should be ascertained from the policy alone. See id.; Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991).

At the time that Gillogly first submitted his claim for benefits under the Policy, and at all times since then, the Oklahoma State Department of Health ("Department") did not license a category of facilities called "nursing homes." Rather, the Department licensed "nursing facilities" and "residential care homes" pursuant to a pair of complementary statutes, the Nursing Home Care Act, Okla. Stat. tit. 63, §§ 1-1900.1 to 1-1952, and the Residential Care Act, Okla. Stat. tit. 63, §§ 1-819 to 1-842.

At all times relevant to this appeal, the Nursing Home Care Act defined "nursing facility" as:

> a home, an establishment or an institution, a distinct part of which is primarily engaged in providing:
>
> > a. skilled nursing care and related services for residents who require medical or nursing care,
> >
> > b. rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or
> >
> > c. on a regular basis, health related care and services to individuals who because of their mental or physical condition require care and services beyond the level of care provided by a residential care home and which can be made available to them only through a nursing facility.

Okla. Stat. tit. 63, § 1-1902(10). The act stated that "[n]o person shall establish, operate, or maintain in this state any nursing facility without first obtaining a license as required by the Nursing Home Care Act." Id. § 1-1903(A). The act also makes clear that its use of the term "facility" "shall not include a residential care home or an adult companion home." Id. § 1-1902(9).

At all times relevant to this appeal, the Nursing Home Care Act defined "residential care home" as:

> any home, establishment, or institution licensed pursuant to the provisions of the Residential Care Act . . . which offers or provides residential accommodations, food service, and supportive assistance to any of its residents or houses any resident requiring supportive assistance. The residents shall be persons who are ambulatory and essentially capable of managing their own affairs, but who do not routinely require nursing care.

Id. at § 1-1902(12). The Residential Care Act provides a similar definition for "residential care home," though the precise wording of that definition was changed after Gillogly requested benefits under the Policy in 2001. Until 2001, the Residential Care Act defined "residential care home" as:

> any establishment or institution . . . which offers or provides residential accommodations, food service, and supportive assistance to any of its residents or houses any residents requiring supportive assistance . . . . Said residents shall be ambulatory and essentially capable of managing their own affairs, but do not routinely require skilled nursing care or intermediate care.

- 10 -

Historical and Statutory Notes, Okla. Stat. tit. 63, § 1-820. In 2001, the

Oklahoma legislature amended the Residential Care Act to define "residential

care home" as:

> any establishment or institution which offers, provides or supports residential accommodations, food service, and supportive assistance to any of its residents or houses any residents requiring supportive assistance . . . . The residents . . . shall be ambulatory and essentially capable of participating in their own activities of daily living, but shall not routinely require nursing services . . . .

Okla Stat. tit. 63, § 1-820(12). Thus, the earlier version of the Residential Care

Act provided that the residents of residential care homes shall not "routinely

require skilled nursing care or intermediate care," instead of stating that the

residents of such homes shall not "routinely require nursing services."

To implement the Residential Care Act, the Oklahoma State Department of

Health issued Residential Care Home Regulations. See Okla. Admin. Code Tit.

310, Ch. 680. At all times relevant to this appeal, these regulations defined

"residential care home" as:

> [a]ny establishment or institution . . . which offers or provides residential accommodations, food service and supportive assistance to any of its residents or houses any residents requiring supportive assistance . . . . Said residents shall be ambulatory and essentially capable of managing their own affairs, but do not routinely require skilled nursing care or intermediate care.

Okla. Admin. Code § 310:680-1-2. Thus, the language of the Residential Care Home Regulations is identical to the language of the earlier version of the Residential Care Act.

**B.   Application**

The Policy's definition of the term "Nursing Home" is not ambiguous. The Policy requires that a "Nursing Home" be "licensed . . . to engage primarily in providing nursing care and related services to inpatients." The form that such a license will take is left to the "appropriate licensing agency" in each area where the Policy is used. The Policy is unambiguous as a matter of law, see Wynn v. Avemco Ins. Co, 963 P.2d 572, 575 (Okla. 1998), because the Policy's definition of the term "Nursing Home" simply is not susceptible to two interpretations on its face. See Cranfill, 49 P.3d at 706. Thus we must interpret the intent of the parties in contracting for insurance from the Policy alone, without examining outside evidence of their understanding of the contract. See id.

VBH does not qualify as a "Nursing Home" under the Policy. In order for a facility to qualify as a "Nursing Home" under the Policy, it must be, inter alia, "licensed by the appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients." It is undisputed that the Department is the "appropriate licensing agency" for the State of Oklahoma. The Department licensed VBH as a "residential care home," not as a "nursing

facility." Under the Nursing Home Care Act, the residents of residential home facilities shall not "routinely require nursing care." Okla. Stat. tit. 63, § 1-1902(12). The act specifically excludes "residential care homes" from its definition of "nursing facilit[ies]." Id. § 1-1902(9). The act also states that "nursing facilit[ies]" that provide "skilled nursing care and related services" do so for individuals who require "care and services beyond the level of care provided by a residential care home." Id. § 1-1902(10). Since VBH is specifically licensed as a residential care home and the Oklahoma statutes require that the residents of VBH shall not routinely require nursing care, VBH is specifically designated by statute as something other than a facility that is "primarily engaged in providing . . . skilled nursing care and related services." It follows that VBH cannot qualify under the Policy as a facility licensed to "engage primarily in providing nursing care and related services." See Gregg v. IDS Life Ins. Co., 692 N.Y.S.2d 182, 183 (N.Y. App. Div. 1999) (denying benefits under a long term care insurance policy because the facility in which the insured resided was not a nursing home as defined by the licensing requirement contained in the policy); see also Waak v. Nat'l Bankers Life Ins. Co., 141 N.W. 2d 454, 456-57 (Neb. 1966) (emphasizing that it is the formal licensing or categorization of an institution that controls whether the institution is covered by an insurance policy); Cullop v. Rogue Valley Physicians' Serv., Inc., 503 P.2d 699, 701 (Or. 1972) (en banc) (noting that an

- 13 -

institution licensed as a rehabilitation center by the state board of health did not constitute an "approved hospital" under an insurance policy requiring that a hospital be licensed to be covered).

It is true that at least one district court reached a different conclusion in an unpublished disposition interpreting a GECA insurance contract that defines "Nursing Home" in the same way as the Policy at issue in this case. In McDonald v. General Electric Capital Assurance, No. CIV-02-614-C (W. D. Okla. May 7, 2003) (unpublished), the district court determined that the insured was entitled to benefits for a stay in an assisted living facility apparently not licensed as a "nursing facility." The court reasoned that "[t]he plain language of the policy does not require a specific type of license," and therefore rejected the insurer's contention that Okla. Stat. tit. 63, § 1-1902 (regulating nursing facilities) was controlling. The court stated that "all that is required is that the facility be licensed to primarily provide nursing care and related services" and summarily concluded that the facility "satisfies this requirement." However, the McDonald court did not discuss how that facility met this requirement or what constitutes

- 14 -

"nursing care."[5]   McDonald is not persuasive in light of the statutory language and the substantial authority to the contrary.

At the time that Gillogly submitted his request for benefits, the Residential Care Act defined "residential care home" as a facility whose residents shall not "routinely require skilled nursing care or intermediate care." Okla. Stat. tit. 63, § 1-820(12). However, the Nursing Home Care Act and Residential Care Act are complementary provisions. Both are contained in Oklahoma's Public Health Code. See Okla. Stat. tit. 63, §§ 1-101 to 1-2703. The two provisions are clearly intended to be read together. See Okla. Stat. tit. 63, § 1-1902(12) (reference in the Nursing Home Care Act to the Residential Care Act).

The Nursing Home Care Act stated that the residents of residential care homes shall not "routinely require nursing care," while the Residential Care Act stated that the residents of such homes shall not "routinely require skilled nursing care or intermediate care." Read together, we must read the phrase "nursing care" used to define "residential care home" in the Nursing Home Care Act as

---

[5]The court did discuss whether the facility provided twenty-four hour "nursing service" as required by a different portion of the policy. In analyzing that portion of the policy, the court rejected the insurer's contention that the facility did not provide "nursing service" because it did not provide "nursing care" as defined by Oklahoma statute. Finding the term "nursing service" ambiguous, and therefore interpreting the term's meaning against the insurer, the court stated that the term "nursing service" included the level of care provided by an assisted living facility. However, the court did not address in detail the question of whether the facility was licensed to provide "nursing care."

- 15 -

synonymous with the phrase "skilled nursing care or intermediate care" used to define "residential care home" in the Residential Care Act.

To the extent that VBH's residential care license allows the facility to provide custodial care, that license is not equivalent to a license to "engage primarily in providing nursing care" within the meaning of the Policy because Oklahoma statutes distinguish "nursing care" from custodial care. The Nursing Home Care Act defines a "nursing facility" as one "primarily engaged in providing . . . skilled nursing care and . . . rehabilitation services, . . . and health-related care . . . beyond the level of care provided by a residential care home and which can be made available only through a nursing facility." (Emphasis added.) Thus, "nursing" care must consist of something more than custodial care. Okla. Stat. tit. 63, § 1-1902(10).

Nor is VBH licensed to provide "nursing care" because the facility is licensed to have nurses provide care to residents. Such an interpretation would mean that virtually any hospital would qualify as a "Nursing Home" under the Policy, and that the insurer would be required to pay a benefit when the insured stays as an overnight resident in a hospital after fulfilling his or her 100-day deductible. This would effectively convert the Policy from a "Long Term Care Insurance Nursing Home Indemnity Policy" to a policy covering some of the hospitalization costs associated with any catastrophic medical event.

- 16 -

Gillogly argues that because the Policy states that it "makes no distinction . . . for different levels of care (whether skilled, intermediate, or custodial) as long as Your Nursing Home Stay is Necessary," the Policy should be interpreted to cover custodial care in a facility licensed as a "residential care home." However, the Policy's provision of coverage for all levels of care in a properly-licensed "Nursing Home" does not provide coverage for any level of care provided in another type of institution. See A. Kimberley Dayton, et al., 3 Advising the Elderly Client, § 24:11 (2005) ("Most long-term care policies today cover all levels of *nursing home* care, including skilled, intermediate, and custodial care.") (emphasis added).

Gillogly contends that because VBH is a distinctly separate part of a hospital—MRHC—and the hospital is licensed to engage primarily in providing nursing care, VBH qualifies as a properly-licensed facility under the Policy. This argument is without merit. Even assuming that MRHC is "licensed . . . to engage in primarily providing nursing care" within the meaning of the Policy, this argument ignores VBH's separate license as a residential care home, effectively rendering the MRHC license a superfluity. Moreover, the argument conflicts with the plain text of the Policy, which defines a "Nursing Home" as "[a] facility or distinctly separate part of a hospital or other institution which is licensed by the appropriate licensing agency to engage primarily in providing nursing care and

- 17 -

related services to inpatients . . . ." [Emphasis added]. The "which is licensed" clause modifies the nouns "facility" and "part"—not the noun "hospital," which is part of the prepositional phrase "of a hospital or other institution."

Gillogly also contends that VBH should qualify as a "Nursing Home" under the Policy because of a note following the Policy's definition of a "Nursing Home" which states:

> The above requirements are typically met by licensed skilled nursing facilities, comprehensive nursing care facilities and intermediate nursing care facilities as well as some specialized wards, wings, and units of hospitals. Those requirements are generally NOT met by: rest homes; homes for the aged; sheltered living accommodations; residence homes; or similar living arrangements.

However, this note only suggests general characteristics that are typical of nursing facilities and it does not purport in any way to modify the licensing requirement contained in the definition of nursing homes.

Finally, Gillogly suggests that because VBH provides the six types of services set forth in bullet points in the Policy, VBH qualifies as the type of facility that the parties thought of as a "Nursing Home" when they contracted for insurance coverage. However, the Policy does not allow facilities to qualify as "Nursing Homes" in two ways, either by being appropriately licensed or by providing certain services. Rather, the Policy allows facilities to qualify as "Nursing Homes" in only one way, defining a "Nursing Home" as a facility that both is licensed "and" provides certain enumerated services.

- 18 -

Because VBH does not qualify as a "Nursing Home" under the Policy, GECA did not breach its contract with Gillogly as a matter of law when it denied Gillogly's request for benefits for his stay at VBH. Therefore, we reverse the district court's grant of summary judgment to Gillogly on his breach of contract claim, and remand the case with instructions that the district court enter judgment for GECA on the claim.

## III. Other Issues

Because we reverse the district court's grant of summary judgment to Gillogly on his breach of contract claim, and direct the district court on remand to enter judgment for GECA on that claim, we also reverse the district court's judgment that GECA acted in bad faith. See Davis v. GHS Health Maint. Org., Inc., 22 P.3d 1204, 1210 (Okla. 2001) ("[A] determination of liability under the contract is a prerequisite to a recovery for bad faith breach of an insurance contract."); Expertise, Inc. v. Aetna Fin. Co., 810 F.2d 968, 972 (10th Cir. 1987) ("[T]he plaintiff obviously must establish that a binding agreement has been breached to invoke this theory [of bad faith breach of contract under Oklahoma law]. Because we have held that the plaintiff failed to establish a breach of an enforceable agreement, we must also conclude that it failed to establish a *prima facie* case of bad faith breach of contract."); McCarty v. First of Georgia Ins. Co., 713 F.2d 609, 612 (10th Cir. 1983) (noting that "[w]hen the Oklahoma Supreme

- 19 -

Court held that claimants must make a 'clear showing that the insurer unreasonably, and in bad faith, withholds payment,' it was simply emphasizing the obvious: if the insured were not entitled to payment, a cause of action for wrongful denial of the claim could not arise") (citation omitted). Therefore, on remand the district court should enter judgment for GECA on Gillogly's claim that GECA acted in bad faith in denying his request for benefits under the Policy.

We affirm the district court's grant of judgment to GECA on Gillogly's punitive damages claim because GECA did not deny Gillogly's request for benefits in bad faith. "It is settled in Oklahoma that for a jury to award punitive damage, actual damages must first be shown." Davidson v. First Bank & Trust Co., Yale, 609 P.2d 1259, 1262 (Okla. 1977), overruled on other grounds by Beneficial Fin. Co. v. Young, 612 P.2d 1357, 1359-60 (Okla. 1980). Because Gillogly did not and could not prove that GECA is liable for acting in bad faith, Gillogly cannot show actual damages resulting from GECA's conduct. Therefore, Gillogly is not entitled to punitive damages, and the district court did not err in granting judgment to GECA as a matter of law on Gillogly's punitive damages claim.[6]

_____

[6]The district court ruled that GECA was entitled to judgment as a matter of law on the issue of punitive damages because Gillogly "presented no evidence that [GECA] either recklessly disregarded its duty to deal fairly and act in good faith with plaintiff or intentionally and with malice breached its duty to deal fairly
(continued...)

## CONCLUSION

We REVERSE the district court's grant of summary judgment to Gillogly on his breach of contract claim. We also REVERSE the district court's entry of judgment in favor of Gillogly on his claim that GECA acted in bad faith. Finally, we AFFIRM the district court's entry of judgment in favor of GECA on Gillogly's punitive damages claim. We REMAND the case with instructions that the district court enter judgment for GECA on Gillogly's claims that GECA breached its contract with Gillogly and acted in bad faith in denying his request for benefits under the Policy.

---

[6](...continued)
and act in good faith with plaintiff." However, "[w]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994) (quotations omitted).