FILED
United States Court of Appeals
Tenth Circuit

January 9, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

ZELLA MILBURN, an individual,

    Plaintiff-Appellee,

v.

                          No. 05-6099

LIFE INVESTORS INSURANCE CO. OF
AMERICA, a foreign corporation,

    Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 04-CV-459-C)**

Stephen S. Mansell, Esq., Mansell & Engell, P.C., (Mark A. Engel, Esq., with him on the brief), for Plaintiff-Appellee Zella Milburn.

Reid L. Ashinoff, Esq., Sonnenschein, Nath, & Rosenthal, LLP, New York, New York (Jeffrey H. Wolf, Esq., Wolf+Law, PC, Fort Worth, Texas, and Mary Robertson, Crowe & Dunlevy, Norman, Oklahoma, with him on the briefs), for Defendant-Appellant Life Investors Insurance Co. of America.

Before **HENRY,** Chief Judge, **MURPHY**, Circuit Judge, and **FIGA**, District Judge.[*]

_____

[*]    The Honorable Phillip S. Figa, United States District Judge for the District of Colorado, sitting by designation. Judge Figa died on January 5, 2008. Judge Figa heard oral argument, participated in the panel's conference of this appeal, and joined in this opinion.

**PER CURIAM.**

## I. JURISDICTION FOR APPEAL

This appeal arises from the district court's order entered December 17, 2004 granting partial summary judgment in favor of plaintiff on the issue of coverage under a Long Term Care Insurance Policy. *See* the "Order" found in App. Vol. III at 927-938.[1] Following the entry of partial summary judgment and settlement of plaintiff's other claims, a final judgment in plaintiff's favor was entered on February 23, 2005. Defendant, Life Investors Insurance Company of America ("LIICA"), now appeals the entry of partial summary judgment and subsequent final judgment. Jurisdiction for the appeal lies under 28 U.S.C. § 1291.

## II. SUMMARY OF CASE

The order granting partial summary judgment in this diversity case construed the insurance policy under applicable Oklahoma law to provide coverage for the type of care which plaintiff incurred, specifically care in an assisted living facility. Defendant contends that while the policy provided a "nursing home" benefit, as defined in the policy

---

[1] The Record on Appeal in this case consists of four volumes of Appendices, three of which were filed by the defendant-appellant and one of which was filed by the plaintiff-appellee. For simplicity's sake, the volumes filed by defendant are cited herein as "App. Vol. I, II or III at__", and the volume filed by plaintiff is cited as "Pl.'s. App. at __".

such benefit did not cover the type of care plaintiff was receiving and thus it properly denied coverage.

The district court found that the language of the policy was not ambiguous, and that the definition of "nursing home" contained in the policy covered the assisted living facility where plaintiff was receiving care. In so doing, the district court rejected defendant's effort to apply various state statutory and regulatory provisions to provide definitions for terms used in the policy, ruling that such extraneous material was not necessary because the policy was not subject to conflicting interpretations.

On appeal the defendant does not argue that the definition of nursing home, as used in its policy, is ambiguous. Rather, it contends that Oklahoma provisions regulating nursing homes are relevant because the policy provides that in order for a facility to be covered under the policy it must be licensed by the appropriate licensing authority to engage primarily in nursing care and related services. Def.'s Brief at 19-23; 32-37. Plaintiff argues that the facility where she resided had the appropriate license and provided the type of care provided by a nursing home, and therefore the district court's ruling correctly found that the policy covered the services provided. Pl.'s Brief at 7-21.

On December 12, 2005, after all appellate briefs in this case were submitted but prior to the oral argument, the Tenth Circuit issued its opinion in *Gillogly v. General Electric Capital Assurance Co.*, 430 F.3d 1284 (10th Cir. 2005). In an opinion authored by Judge Ebel, the panel applied Oklahoma law to a long-term care policy issued by a different Oklahoma insurer, but which defined "nursing home" in exactly the same

language as used in the LIICA policy. The panel in *Gillogly* found that the policy there did not provide coverage for the insured's stay in a "residential care home" because such facility is not a nursing home licensed by the appropriate authority. 430 F. 3d at 1290.

On December 21, 2005, appellant-defendant tendered the *Gillogly* case as supplemental authority, along with a motion for leave under Rule 28(j) to file a letter brief in excess of the word limit arguing that the *Gillogly* decision is dispositive here. That motion was referred to the panel but apparently not formally ruled on. On December 28, 2005, plaintiff-appellee filed a letter brief arguing that *Gillogly* does not dispose of this case. On September 19, 2006, prior to the oral argument, defendant filed a copy of the published decision in *Gillogly* as supplemental authority under Fed. R. App. P. 28(j). The defendant's motion for leave to file the letter brief is granted and both post-briefing submissions from the parties have been considered by this panel.

### III.  UNDISPUTED FACTS

As the district court found, the essential facts underlying plaintiff's claims are not disputed. Plaintiff purchased the Long Term Care Insurance Policy at issue here ("policy") from the defendant in 1993. In 1999, when plaintiff was approximately 89 years of age, she moved into a facility known as The Village on Lee ("The Village"), located in Lawton, Oklahoma. Plaintiff apparently did not make any claim for coverage under the policy between 1999 and 2002. In May 2002, plaintiff was hospitalized for physical ailments, and after her discharge returned to The Village where she required daily care in the activities of dressing, walking, bathing, getting in and out of bed, and

4

later taking medication. The Village provides this form of daily care for a fee. At that time Plaintiff submitted two claims to defendant for benefits under the policy. The defendant denied both claims (Order at 1-2).

It is undisputed that the policy provides coverage for stays in a nursing home, referred to as the "nursing home benefit." *See* App. Vol. II at 270, 276-77.[2] The policy provides that it will "pay a benefit for each Day of Confinement, after the Policy Elimination Period, while you are confined in a Nursing Home during a Covered Period of Confinement." App. Vol. II at 276. The definition section of the policy defines a "Nursing Home" as follows:

> A facility or distinctly separate part of a hospital or other institution which is licensed by the appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients and:
>
> (1) Provides 24 hour-a-day nursing service under a planned program of policies and procedures which was developed with the advice of, and is periodically reviewed and executed by, a professional group of at least one Doctor and one Nurse; and
>
> (2) Has a Doctor available to furnish medical care in case of emergency; and
>
> (3) Has at least one Nurse who is employed there full time (or at least 24 hours per week if the facility has less than 10 beds); and
>
> (4) Has a Nurse on duty or on call at all times; and

---

[2] Copies of the policy are contained at various places in the Appendix. This opinion cites to the copy of the policy, as referenced in the parties' appellate briefs, found in App. Vol. II, at 267-285.

5

(5) Maintains clinical records for all patients; and

(6) Has appropriate methods and procedures for handling and administering drugs and biologicals.

**Note:** These requirements are typically met by licensed skilled nursing facilities, comprehensive nursing care facilities and intermediate nursing care facilities; as well as some specialized wards, wings and units of hospitals. They are NOT met by: rehabilitation hospitals; rest homes; homes for the aged; sheltered living accommodations; residence homes or independent living units.

App. Vol. II at 274. The identical definition of "nursing home," including the interpretive note, was used in the policy at issue in *Gillogly*. *See* 430 F.3d at 1286. The policy in the instant case, like the policy in *Gillogly*, does not define "nursing care or related services" as used in the first sentence of the policy's definition of a "Nursing Home." It also appears undisputed that The Village was licensed under Oklahoma law as an "assisted living facility" and not as a nursing facility (Order at 2 and 5). By letter dated July 1, 2002, plaintiff's claim for benefits was denied by defendant on the grounds that The Village was not "licensed to engage *primarily* in providing nursing care" and there was no indication that it provided "24-hour nursing services." App. Vol. II at 345-46.

## IV. PROCEEDINGS BELOW

On April 9, 2004, plaintiff filed her complaint in the Western District of Oklahoma alleging that defendant "breached its duty to deal fairly and act in good faith towards the Plaintiff" in "violation of the covenant of good faith and fair dealing" entitling plaintiff to actual damages, and further alleging that the intentional and malicious acts of defendant

6

entitled plaintiff to punitive damages. App. Vol. I at 12-13. On October 22, 2004, plaintiff moved for partial summary judgment solely as to the issue of coverage under the policy. App. Vol. I at 26. On November 24, 2004, defendant moved for summary judgment as to plaintiff's "bad faith" claim. App. Vol. II at 219. On December 17, 2004, the district court granted plaintiff's motion for partial summary judgment. App. Vol. III at 927. On January 19, 2005, the district court denied defendant's motion for summary judgment. App. Vol. III at 1033-38. On February 9, 2005, plaintiff filed a motion for "entry of final judgment on the contract" stating that the parties had "settled the issue of bad faith" and requesting judgment for contract benefits due and owing in the amount of $36,500. App. Vol. III at 1040. On February 22, 2005, defendant filed an "objection" to plaintiff's request for entry of judgment arguing that the court's ruling on coverage was in error, but otherwise not objecting to the entry of judgment on the contract aspect of the case. App. Vol. III at 1043. The district court entered a final judgment on February 23, 2005. App. Vol. III at 1047. The only issue presented on this appeal is whether the district court erred in its construction of the policy and in entering summary judgment for plaintiff on that issue.

## V. STANDARD OF REVIEW AND APPLICABLE LAW

Summary judgment is appropriate when the pleadings, deposition transcripts, affidavits and evidentiary material show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c). When the relevant facts are undisputed, this Court reviews *de novo* the district

court's interpretation of an insurance policy as well as its other legal conclusions made on summary judgment. *Houston General Ins. Co. v. American Fence Co.*, 115 F.3d 805, 806 (10th Cir. 1997). As the Court did in *Gilloglly, supra*, 430 F.3d at 1288, this Court reviews *de novo* the issue of whether the plaintiff's policy provided coverage for the treatment she received at The Village.

Here, there is no dispute that the substantive law of Oklahoma applies to the interpretation of the policy in this diversity case. The applicable substantive law of Oklahoma is summarized in *Gillogly,* quoting from *C.F. Braun & Co. v. Okla. Gas & Elec. Co.,* 603 F.2d 132, 133 n.1 (10th Cir 1979), as follows:

> [p]arties to [an] insurance contract . . . are bound by [the] terms of [the] contract and courts will not undertake to rewrite [the] terms thereof. The construction of an insurance policy should be a natural and reasonable one, fairly construed to effectuate its purpose, and viewed in the light of common sense so as not to bring about an absurd result . . . . A policy of insurance is a contract and should be construed as every other contract, that is, where not ambiguous, according to its terms.

430 F.3d at 1289 (citation omitted). As *Gillogly* further states: "if a reasonably prudent lay person would find that a term used in a policy is not susceptible to two interpretations on its face, *see Cranfill v. Aetna Life Ins. Co*., 49 P.3d 703, 706 (Okla.2002), the intent of the parties should be ascertained from the policy alone. *See id*.; *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla.1991)." *Id.*

8

## VI. ANALYSIS

Applying these principles, the district court rejected defendant's argument that The Village did not qualify as a "nursing home," because defendant's position was based on Oklahoma statutory and regulatory definitions of "nursing facilities" and "nursing care." (Order at 6). The district court held that the language of the policy was not ambiguous and therefore declined to consider the defendant's proferred explanations of the policy terms, ruling that extrinsic evidence of their meaning was not necessary. *Id*. at 6-8.

However, as noted above, the term "nursing care and related services," which is used in the definition of "Nursing Home" is not itself a defined term in the policy. In *Gillogly, supra*, where the same phrase was also undefined in the policy at issue in that case, the Tenth Circuit found that the definition of "Nursing Home" was not ambiguous, yet it looked to Oklahoma state law to supply the meaning of the policy language. 430 F.3d at 1289-90. Although the *Gillogly* policy did not expressly incorporate Oklahoma law or regulations, review of the law of Oklahoma was necessary to determine whether the facility was licensed by the "appropriate licensing agency" as required by the policy, and whether the license held by the facility permitted it to "engage primarily in providing nursing care and related services to inpatients," as also required by the policy.

*Gillogly* first noted that the Oklahoma State Department of Health did not license a category of facilities called "nursing homes" but did license entities referred to as "nursing facilities" and another category of entities called "residential care homes." 430

9

F.3d at 1289.  It found that the Oklahoma Nursing Home Care Act defined "nursing facility" as:

> a home, an establishment or an institution, a distinct part of which is primarily engaged in providing:
>
> a. skilled nursing care and related services for residents who require medical or nursing care,
>
> b. rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or
>
> c. on a regular basis, health related care and services to individuals who because of their mental or physical condition require care and services beyond the level of care provided by a residential care home and which can be made available to them only through a nursing facility.

430 F.3d at 1290 citing to Okla. Stat. tit. 63, § 1-1902(10).  *Gillologly* noted that the Nursing Home Care Act provided that "[n]o person shall establish, operate, or maintain in this state any nursing facility without first obtaining a license as required by the Nursing Home Care Act."  *Id.,* citing to Okla. Stat. tit. 63, § 1-1903(A), and that the statute makes clear that its use of the term "facility" "shall not include a residential care home or an adult companion home." *Id.*, citing to Okla. Stat. tit. 63, § 1-1902(9).  By contrast, the court found that a residential care home was licensed under other criteria, all the specifics of which are not pertinent to the instant case, but which included the requirement that the residents of such homes "do not routinely require skilled nursing care or intermediate care."  430 F.3d at 1290.   Based on this statutory arrangement, *Gillogly* found that the facility where plaintiff stayed, Van Buren House ("VBH"), did not qualify as a "Nursing

10

Home" under the policy definition because, although licensed by the Oklahoma Department of Health, it was licensed as a residential care home and not as a nursing facility. As a residential care home, Oklahoma statutes required that VBH's residents could not "routinely require nursing care," and therefore it was not licensed to "engage primarily in providing nursing care and related services to inpatients" as required under the policy definition of "Nursing Home." 430 F.3d at 1291. Thus the *Gillogly* opinion concluded that "[i]t follows that VBH cannot qualify under the Policy as a facility licensed to 'engage primarily in providing nursing care and related services.'" 430 F. 3d at 1291.

The same can be said of The Village's licensing situation. While there is no dispute that The Village is licensed "by the appropriate licensing agency" as required by the policy, it is licensed as an "assisted living facility" not as a nursing home (Order at 2). At the time plaintiff submitted her claim, assisted living facilities were licensed by the Oklahoma Department of Health under the Continuum of Care and Assisted Living Act (the "Assisted Living Act"), Okla. Stat. tit. 63, §§ 1-890.1 *et seq*. The statute defines an "assisted living center" as "any home or establishment offering, coordinating, or providing services to two or more persons who . . . . d. may need intermittent or unscheduled nursing care." Okla. Stat. tit. 63, § 1-890.2(1). The statute further provides that: "[i]ntermittent nursing care and home health aide services may be provided in an assisted living facility by a home health agency;" *Id*. Although the Assisted Living Act does not expressly provide, as did the language of the residential care home statute at issue in *Gillogly*, that residents may "not routinely require nursing care," the regulations promulgated under the Assisted

11

Living Act provide that "[a]n assisted living center shall not care for any resident needing care in excess of the level that the assisted living center is licensed to provide or capable of providing." 310 Okla. Admin. Code § 663-3-1(a). Another regulation provides, in pertinent part, that "[i]f an assisted living center finds pursuant to 310:663-3-4 that a resident is inappropriately placed, the assisted living center shall inform the resident and/or representative if any. If voluntary discharge or transfer is not arranged, the assisted living center shall provide written notice to the resident and to the resident's representative, giving the resident (10) days notice of the assisted living center's intent to discharge or transfer the resident to an appropriate care provider." 310 Okla. Admin. Code § 663-3-5(a).

Under this statutory and regulatory scheme, it appears that an assisted living center may provide "intermittent or unscheduled nursing care" but is not licensed to engage "primarily in providing nursing care and related services to inpatients" as provided in the plaintiff's policy. If the patient needs regular nursing care, the regulatory scheme requires that the patient be transferred to a more appropriate facility. Accordingly, as was true of the VBH facility at issue in the *Gillogly* case, The Village does not qualify under the policy as a facility licensed to "engage primarily in providing nursing care and related services to inpatients."

Plaintiff's brief on appeal argues that The Village meets the policy definition of a nursing home because it provided all six of the services listed under the policy definition of "Nursing Home." However, this same argument was made in *Gillogly* but rejected by the

12

court. There, the court found that the policy required that the facility *"both"* be licensed as a nursing home and provide the enumerated services. 430 F.3d at 1284 (emphasis in original). The fact that The Village may provide the enumerated services does not matter in the absence of the facility being licensed as a nursing home.

Plaintiff also appears to argue in her brief on appeal that the policy at issue here, if interpreted as suggested by defendant, may not be in compliance with provisions of the Oklahoma law providing minimum standards for long term insurance policies. Citing to Oklahoma regulation, 365 Okla. Admin. Code § 10-5-42, plaintiff states that the regulation requires insurance policies to define the services covered under the policy. She suggests that the language in the sub-paragraphs under the definition of Nursing Home, which specify the services, constitutes the entire coverage provision of the policy under this regulation. Pl.'s Brief at 7-8. But as plaintiff acknowledges, the above regulation also states that the "definition [of covered services] may require that the provider be appropriately licensed." *Id.* In the instant case, the policy both described the covered services and required the provider be licensed "to engage primarily in providing nursing care and related services," as noted above. Thus, the regulation referenced by the plaintiff is met in this case and does not change the Court's interpretation of the policy.

Finally, plaintiff suggests that defendant has failed to explain why coverage is not provided for plaintiff's treatment at The Village given the "Note" that appears after the policy definition of "Nursing Home," and its statement that the requirements of the definition are "typically met" by licensed "intermediate care facilities." Pl.'s Brief at 19-

13

21. Plaintiff contends that The Village is at least a licensed "intermediate care facility." A similar argument was made in *Gillogly* but rejected, the court stating, "this note only suggests general characteristics that are typical of nursing facilities and it does not purport in any way to modify the licensing requirement contained in the definition of nursing homes." 430 F.3d at 1293. Moreover, as plaintiff acknowledges, the state regulations that defined "intermediate care facilities" were supplanted and revised before the plaintiff's claim arose, and no longer described the type of service provided at The Village. Pl.'s Brief at 20-21.

## VII. CONCLUSION

Because The Village does not qualify as a "Nursing Home" under the policy, LIICA did not breach its contract with plaintiff as a matter of law when it denied her request for benefits. Therefore, we REVERSE the grant of partial summary judgment to plaintiff, and the entry of the final judgment in her favor, and remand the case with instructions that the district court enter judgment for Defendant LIICA on the plaintiff's claim.

14

<u>Milburn v. Life Investors Insurance Company of America</u>, No. 05-6099

**HENRY, J.**, joined by **MURPHY, J.**, concurring,

I agree with the result reached by the majority but write separately to note my serious concerns about the controlling case, <u>Gillogly v. General Electric Capital Assurance Corp</u>, 430 F.3d 1284 (10th Cir. 2005). I also have more general concerns about the interpretation of insurance policies purporting to provide coverage for nursing care.

As the majority observes, this court held in <u>Gillogly</u> that an insurance policy with language identical to Ms. Milburn's did not provide coverage for a policyholder's stay in a residential care home because that facility was not "licensed by the appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients." 430 F.3d at 1286. In my view, the reliance on this policy language is highly troubling for several reasons.

First, by directing the policyholder to state licensing schemes that may well change between the time that the policy is purchased and the time that the policyholder moves to the facility and seeks benefits, the policy language presents a moving target. For example, in <u>Gillogly</u>, we examined the licensing statutes in effect in *2001* "[a]t the time that [the policyholder] submitted his request for benefits," 430 F.3d at 1291, despite the fact that the policy had been purchased in *1989*. <u>See</u> id. at 1286. This time lag may present insurmountable hurdles for a policyholder, who in light of <u>Gillogly</u> must apparently anticipate how the state's licensing framework will apply to the facility in which she will be living at some uncertain date in the future. To me, the imposition of

such a burden is inconsistent with Oklahoma's established rule that we construe the policy "from the standpoint of a reasonably prudent lay person." Am. Econ. Ins. Co. v. Bogdahn, 89 P.3d 1051, 1054 (Okla. 2004) (internal quotation marks omitted).

Second, even if they do not change, licensing schemes for nursing care facilities may be quite complicated. In my view, it makes sense to use a state license as a floor rather than a ceiling. In other words, I think that a reasonable policyholder can understand that he is purchasing coverage for a facility that holds some kind of valid medical facility license. But to expect her to understand and then predict what particular license the facility will hold may be too much, particularly if the policy uses ambiguous terms like "nursing care and related services" and the licensing scheme creates different licenses for "nursing homes," "assisted living centers," "residential care homes," and other similar facilities.

Third, as medical technology continues to develop, I suspect that the task of predicting the kind of facility where she will live will become even harder for the typical policyholder. The level of care that once could be provided only in a nursing home may well be provided in a less comprehensive facility with a different license and fewer medical personnel on staff. Again, to rely on a policy's general reference to a licensing scheme to define the scope of coverage seems likely to thwart the reasonable expectations of the policyholder.

I also note that, even though Gillogly is controlling, this is a closer case. The facility where Ms. Milburn resides is licensed as an assisted living center, not a residential

2

care home.   Unlike the licensing provision at issue in <u>Gillogly</u>, The Continuum of Care and Assisted Living Act (the licensing provision regarding assisted living centers), OKLA. STAT. tit. 63 § 1-890.1 to 890.7, expressly refers to nursing care.  Under that act, "assisted living center" means:

> any home or establishment offering, coordinating or providing services to two or more persons who:
>
> > a. are domiciled therein,
> > b. are unrelated to the operator,
> > c. by choice or functional impairments, need assistance with personal care or <u>nursing supervision</u>,
> > d. may need <u>intermittent or unscheduled nursing care,</u>
> > e. may need medication assistance, and
> > f. may need assistance with transfer and/or ambulation

OKLA. STAT. tit. 63 § 1-890.2 (emphasis added).

Importantly, the care encompassed by the  phrase "intermittent or unscheduled nursing care" is not as limited as one might think.  Accompanying regulations regarding assisted living centers define "intermittent or unscheduled nursing care" as "skilled nursing care given by a licensed practical nurse or registered nurse that is not required twenty-four (24) hours a day."  <u>See</u> OKLA. ADMIN. CODE §  310:663-1-2.  The fact that an assisted living center is authorized to provide "skilled nursing care" for eight, ten, or twelve hours a day (but not twenty-four) provides some support for  Ms. Milburn's reading of the policy.

Nevertheless, I agree with the majority that our ruling in <u>Gillogly</u> directs us, regardless of my concerns about it, to interpret the policy term "licensed by the

3

appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients" to apply only institutions licensed as "nursing facilities" under Oklahoma law.  Maj. Op. at 9-10.   The facility in which Ms. Milburn resides does not hold such a license.

Even though Ms. Milburn does not have coverage, I urge the defendant insurer here, as well as other insurers, to provide clearer definitions of the crucial terms.  Further, I hope that Oklahoma policymakers in this field, including the legislature, the Insurance Commissioner, and the Department of Health, will take a close look at efforts to add simple clarity to this important area of law.  The fact that a distinguished district court judge read the policy in the same way as Ms. Milburn suggests to me that some corrective action is necessary to protect policyholders' reasonable expectations.