Erwin J. GUTOWITZ; and Howard Gutowitz, as representative of Erwin J. Gutowitz, Plaintiffs,

v.

TRANSAMERICA LIFE INSURANCE COMPANY, Defendant.

Case No. CV 14–06656 MMM (JPRx)

United States District Court, C.D. California.

Signed August 14, 2015

---

Barry P. Goldberg, Barry Goldberg Law Offices APLC, Woodland Hills, CA, Eric W. Berry, Berry Law PLLC, New York, NY, for Plaintiffs.

Becky J. Belke, Margaret Levy, Manatt Phelps and Phillips LLP, Los Angeles, CA, Jeffrey J. Wolf, The Wolf Law Firm PC, Southlake, TX, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE

Plaintiffs Erwin J. Gutowitz and Howard Gutowitz, as representative of Erwin J. Gutowitz ("plaintiffs"), filed this action on August 25, 2014, against Transamerica Life Insurance Company ("Transamerica").[1] On April 24, 2015, Transamerica filed a motion for summary judgment.[2] Plaintiffs oppose the motion.[3]

1. Complaint, Docket No. 1 (Aug. 25, 2014).

2. Motion for Summary Judgment ("Motion"), Docket No. 31 (Apr. 24, 2015).

3. Opposition to Defendant's Motion for Summary Judgment ("Opposition"), Docket No. 34 (June 10, 2015). On July 27, 2015, plaintiffs filed an *ex parte* application for leave to file a supplemental memorandum and accompanying exhibits in opposition to summary judgment. (*Ex Parte* Application for Leave, Docket No. 61 (July 27, 2015).) The supplemental memorandum argues that policies issued by Transamerica after Gutowitz's policy foreclose certain arguments Transamerica advances regarding the fact that the policy terms "inpatient," "patient," and "confinement" are irreconcilable with coverage for an assisted living facility. (*Id.*, Exh. 1 (Supplemental Memorandum).) They argue that Transamerica did not produce these documents until July 24, 2015, after their opposition was due, and that this makes their *ex parte* application proper. As discussed *infra*, on the basis of evidence already in the record (i.e., the Transamerica policy plaintiffs proffered with their opposition), as well as cases interpreting other Transamerica policies, the

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Life Insurance Policy

In 1991, Erwin Gutowitz applied for a Transamerica long-term care policy.[4] Based on his application, Transamerica issued Policy No. 889530043, with an effective date of August 16, 1991.[5] As relevant here, the policy includes a Daily Nursing Home Benefit as well as a Home Health Care Benefit.[6] The policy requires that, to qualify for nursing home benefits, the insured present a physician certification stating that such treatment is medically appropriate. Charges must be incurred while the policy is in force, and the "care or services must be provided in a Nursing Home."[7] The policy does not mandate that the insured obtain "prior approval of Nursing Home care."[8] Furthermore, "care received at a nursing facility which is not in full compliance with the definition of a Nursing Home will still meet the [policy requirements], but only if [Transamerica's] Personal Care Advisor pre-certifies that the facility substantially complies."[9]

The policy defines a Nursing Home as:

"A facility, or that part of one, which: (1) is operating under a license issued by the appropriate licensing agency: (2) is engaged in providing, in addition to room and board accommodations, nursing care and related services on a continuing inpatient basis to 6 or more individuals; (3) provides, on a formal prearranged basis, a Nurse who is on duty or on call at all times; (4) has a planned program of policies and procedures developed with the advice of, and periodically reviewed by, at least one Physician; and (5) maintains a clinical record of each patient. It may be a distinct part of a hospital or other institution.

"It is NOT a place that is primarily used for rest; for the care and treatment of mental diseases or disorders, drug addiction, or alcoholism; for day care or for educational care; or a retirement home or community living center."[10]

The policy also provides a "Home Health Care Benefit."[11] Home Health Care is defined as "[s]ervices provided by or through a Home Health Care Agency and while [the insured is] not confined to a hospital or nursing home."[12] A Home

---

court concludes that Transamerica's arguments lack merit. Because the court interprets the policy in the manner urged by plaintiffs, the court declines to permit them to file supplemental opposition and additional evidence.

At the hearing, Transamerica urged the court to consider plaintiffs' supplemental evidence, contending that it favored its policy interpretation. Transamerica refused to produce this evidence for months, forcing plaintiffs to file a motion to compel. It was only after Magistrate Judge Rosenbluth granted the motion that Transamerica produced the documents. Given this chronology, the court denies Transamerica's request that it consider the evidence for the purposes of granting summary judgment in its favor.

4. Declaration of Chastity Walker ("Walker Decl."), Docket No. 31–2 (Apr. 24, 2015), ¶ 4.

Gutowitz submitted his application to Transamerica Occidental Life Insurance Company ("TOLIC"). Effective October 1, 2008, Transamerica became successor by merger to TOLIC. (*Id.*, ¶ 3.)

5. *Id.*, ¶ 4; see also *id.*, Exh. 35 ("Policy") at 5.

6. Policy at 5.

7. *Id.* at 12.

8. *Id.*

9. *Id.*

10. *Id.* at 10.

11. *Id.* at 5.

12. *Id.* at 8.

Health Care Agency is

> "[a]n entity which provides care and services at [the insured's] home or other residence; is primarily engaged in providing residential health care services under policies and procedures established by a group of professionals, including at least one Physician and one Nurse,[13] and: (1) is licensed by state law as a Home Health Care Agency; or (2) is accredited as a Home Health Care Agency or as a provider of Home Health Care services by the National League of Nursing, American Public Health Association or Joint Commission on Accreditation of Hospitals." [14]

The "General Exclusions and Limitations" section of the policy describes "[l]osses not [c]overed," as "treatment resulting from mental, nervous, psychotic or psychoneurotic deficiencies or disorders without demonstrable organic disease." [15] The policy makes clear, however, that it "WILL cover qualifying stays or care resulting from significant destruction of brain tissue with resultant loss of brain function, including, but not limited to, pro-

gressive degenerative, and dementing illnesses, including, but not limited to, Alzheimer's disease. If a particular disease can only be determined with an autopsy, a clinical diagnosis will be accepted." [16]

### B. Gutowitz's Receive Nursing Home Benefits Claim

On November 22, 2013, Howard Gutowitz sent Transamerica a partially completed claim form seeking benefits under the policy for his father, Erwin Gutowitz; the claim form did not identify the facility Gutowitz was going to enter.[17] On December 13, 2013, Gutowitz moved into Apartment No. 235 at Aegis Living of Ventura ("Aegis").[18] Aegis is a licensed Residential Care Facility for the Elderly ("RCFE").[19] It is not licensed as a nursing home.[20] Because Aegis is an RCFE, people living there are "residents" of a "community." They have their own apartments with private bathrooms, closets, refrigerators, and locking doors.[21] The facility is not licensed to, nor does it, provide 24–hour skilled nursing care.[22] Nonetheless, although coverage is "not guaranteed," there is typically an on duty nurse present during the day shift.[23] There is also a nurse on call 24

---

**13.** A nurse is anyone "duly licensed as either: (1) a Registered Nurse (RN); (2) a Licensed Practical Nurse (LPN); or (3) a Licensed Vocational Nurse (LVN)." (*Id.* at 10.) A physician is a "Doctor [or] a duly licensed medical practitioner other than a Nurse, who is practicing within the scope of his or her license." (*Id.*)

**14.** *Id.* at 9.

**15.** *Id.* at 20–21.

**16.** *Id.* at 21.

**17.** Walker Decl., ¶ 9. See also *id.*, Exh. 36 ("Claim Form").

**18.** Walker Decl., Exh. 14 ("Aegis Agreement").

**19.** Walker Decl., Exh. 39 (Department of Social Services License to Aegis Senior Communities, LLC ("License")).

**20.** Declaration of Margaret Levy ("Levy Decl."), Docket No. 31–5 (Apr. 24, 2015), Exh. C (Deposition of Anitra Sommer ("Sommer Depo.")) at 187:23–25 ("Q. Is it licensed as a nursing home? A. No, sir.").

**21.** Levy Decl., Exh. D (Deposition of William Phelps ("Phelps Depo.")) at 117:10–21, 120:5–8.

**22.** Walker Decl., Exh. 57 (Consumer Disclosure Statement) at 3; Phelps Depo. at 68:16–18 ("Q. Does Aegis of Ventura provide skilled nursing care? A. No.").

**23.** Phelps Depo. at 135:14–18 ("Q. Do you provide licensed nursing coverage on the day shift? A. Yes. Q. Okay. A. But not guaranteed"); Declaration of Eric Barry ("Barry Decl."), Docket No. 43–2 (June 11, 2015), Exh. 14 (Deposition of Anitra Sommer ("Sommer Depo.")) at 142:21–23 ("Now, is there typically one registered nurse on the

hours a day.[24]

Aegis provides special care for persons with dementia. Its consumer disclosure statement states:

> "Dementia special care will be provided in a designated area of the community. Services available specifically to residents with dementia[ ] include individualized activity programming, specialized training to staff, minimizing the use of psychotropic medication, a physical environment geared to the needs of residents with dementia, snacks and hydration, and expanded family communication and partnership." [25]

Gutowitz does not currently reside in the dementia special care unit but in the facility's general "assisted living" unit.[26]

### C. Transmerica's Investigation and Denial of Nursing Home Benefits

As noted, the claim form submitted to Transamerica on Gutowitz's behalf did not identify the care provider or the benefit claimed.[27] After Transamerica determined that Gutowitz was considering Aegis as a possible care provider, it obtained a copy of Aegis' license to determine whether Aegis satisfied the policy's Nursing Home definition.[28] Based on its review of Aegis' license, Transamerica determined that Ae-

gis was not a Nursing Home as defined in the policy; it advised plaintiffs of this in a letter, which also provided a list of covered nursing facilities.[29]

On March 4, 2014, Gutowitz' doctor, Scott Tushla, and Anitra Sommer, Aegis' marketing director, faxed letters to Transamerica urging that Gutowitz be permitted to remain at Aegis.[30] Dr. Tushla stated that Gutowitz was "doing very well and is very happy at his current facility," and specifically advised against moving him elsewhere.[31] Sommer stated that, "in contrast to a nursing home, [Aegis was] specialized in providing the high level of socialization Alzheimer's patients such as [ ] Gutowitz require[ ]." [32] On March 18, 2014, Transamerica denied coverage on the basis that Aegis was not a covered Nursing Home. The denial letter explained that in contrast to nursing homes that are licensed to "provide nursing care and related services on a continuing inpatient basis," as required by the policy definition, a RCFE is prohibited from providing such care by California law.[33]

On March 27, 2014, Gutowitz inquired whether Transamerica would cover Aegis' expenses under the Home Health Care Benefit.[34] On April 10, 2014, Transamerica advised that it would pay this type

---

day shift for those, all 79 folks that reside here? A. Yes.").

24. Sommer Depo. at 241:3–7 ("Does Aegis of Ventura—does this facility have a nurse who is on-call 24 hours a day? A. Yes. Q. Okay. And how do you know that? A. That's our protocol.").

25. Consumer Disclosure Statement at 5.

26. Sommer Depo. At 142:3–7 ("Q. And tell me how is the facility organized. A. There is the assisted living and the memory care. Q. And which part of the facility does Mr. Gutowitz reside in? A. Assisted living.").

27. See Claim Form.

28. Walker Decl., ¶ 9.

29. Id., Exh. 40 (Letter Re: Aegis and Nursing Home Benefits).

30. Id., Exh. 44 (Fax Containing Letters) at 1.

31. Id.

32. Id. at 2.

33. Id., Exh. 46 (Coverage Determination Letter).

34. Id., Exh. 47 (March 27, 2014 Inquiry Re: Home Health Care Benefits).

of benefits so long as the services were provided by a Home Health Care Agency as defined in the policy.[35] On April 30, 2014, Transamerica received a letter from one of Gutowitz's lawyers, Barry Goldberg; Goldberg asserted that the Nursing Home Benefit covered Aegis' expenses because Aegis was a Nursing Home as defined in the policy.[36] On May 20, 2014, Transamerica agreed to reconsider Gutowitz's request for Nursing Home Benefits.[37] It engaged an independent care coordination firm, CareScout, to conduct an evaluation as to whether Aegis met the policy's Nursing Home definition.[38]

In July 2014, CareScout reported the results of its investigation. It had sent a questionnaire to Aegis, and received responses indicating that Aegis was an "assisted living facility/unit"; that it was not a nursing home; that it did not have a facility "for patients who require nursing care on a continuing inpatient basis"; that it was not "licensed to engage primarily in providing nursing care and related services"; and that it provided no "continuous nursing care services." [39] Based on CareScout's report, Transamerica informed plaintiffs on July 21, 2014, that it had determined Aegis was not a Nursing Home as defined in the policy.[40] Transamerica nonetheless agreed to coverage under the Home Health Care Benefit.[41] As of April 21, 2015, Transamerica has paid $37,125.69 in Home Health Care Benefits for the period Gutowitz has resided at Aegis.[42]

### D. Gutowitz's Claims

Plaintiffs seek a declaration that Gutowitz's stay at Aegis is covered under the policy's Nursing Home Benefit and that he is eligible to receive Alzheimer's care benefits under the policy. He also alleges claims for breach of contract; breach of the implied covenant of good faith and fair dealing; and bad faith denial of insurance benefits.[43]

## II. DISCUSSION

### A. Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56. A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out

---

35. *Id.*, Exh. 48 (Response to March 27, 2014 Inquiry).

36. *Id.*, Exh. 49 (Goldberg Letter).

37. *Id.*, Exh. 50 (Reconsideration Letter).

38. Walker Decl., ¶ 15.

39. *Id.*, Exh. 8 ("Questionnaire Responses").

40. *Id.*, Exh. 53 (Follow-up Denial of Coverage) at 1.

41. *Id.* at 2.

42. Walker Decl., ¶ 20.

43. Complaint, ¶¶ 27–75.

that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED. R. CIV. PROC. 56(e)(2). Evidence presented by the parties at the summary judgment stage must be admissible. FED. R. CIV. PROC. 56(e)(1). In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electric Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

### B. Legal Standard Governing Interpretation of Insurance Contracts

■ Ordinary rules of contract interpretation apply to insurance contracts. *Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." CAL. CIV. CODE § 1636. Such intent is to be inferred, if possible, solely from the "written provisions of the contract." *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 822, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990). If contractual language is clear and explicit, it governs. CAL. CIV. CODE § 1638. See *Baker v. Nat'l Interstate Ins. Co.,* 180 Cal.App.4th 1319, 1327, 103 Cal. Rptr.3d 565 (2009) ("If the language of the policy is not ambiguous, then the coverage inquiry ends, and the court determines coverage by applying the plain meaning of the unambiguous provisions of the policy"); *S. Cal. Edison Co. v. Superior Court,* 37 Cal.App.4th 839, 848, 44 Cal.Rptr.2d 227 (1995) ("When a dispute arises over the meaning of contract language, the first

question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over").

■ A policy's language is ambiguous when it is susceptible of two or more reasonable interpretations. *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.,* 9 Cal.4th 27, 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 (1994). Ambiguities may concern the fact or extent of coverage, *Continental Casualty Co. v. Phoenix Construction,* 46 Cal.2d 423, 437–38, 296 P.2d 801 (1956), and may arise from contradictory or necessarily inconsistent language in different portions of the policy, *Delgado v. Heritage Life Ins. Co.,* 157 Cal.App.3d 262, 271, 203 Cal.Rptr. 672 (1984). A court may not adopt a strained or absurd interpretation of the policy language in order to find ambiguity where none would otherwise exist. *La Jolla Beach & Tennis Club,* 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048.

■ When a court concludes that policy language is ambiguous, it examines whether a finding of coverage is consistent with the objectively reasonable expectations of the insured. *Baker,* 180 Cal.App.4th at 1328, 103 Cal.Rptr.3d 565. See also *Bank of the West,* 2 Cal.4th at 1264–65, 10 Cal. Rptr.2d 538, 833 P.2d 545 ("If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it," quoting CAL. CIV. CODE § 1649). In determining whether coverage is consistent with the insured's objectively reasonable expectations, the disputed policy language must be examined in the context of its intended function in the policy. *Baker,* 180 Cal.App.4th at 1328, 103 Cal.Rptr.3d 565; *Nissel v. Certain Underwriters at Lloyd's of London,* 62 Cal.App.4th 1103, 1111–12, 73 Cal.Rptr.2d

174 (1998) ("[T]he disputed policy language must be examined in context with regard to its intended function in the policy. This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense,' " citing *Bank of the West*, 2 Cal.4th at 1265, 1276, 10 Cal.Rptr.2d 538, 833 P.2d 545).

█ Where ambiguity remains after application of the reasonable expectations test, the court construes the ambiguous policy language against the insurer and in favor of coverage. *Baker*, 180 Cal.App.4th at 1328, 103 Cal.Rptr.3d 565. In doing so, however, a court cannot rewrite the policy and bind an insurer to cover a risk that it did not contemplate covering and for which it was not paid. *Id.*

### C. Whether Plaintiffs' Declaratory Relief and Breach of Contract Claims Fail as a Matter of Law

Transamerica argues that plaintiffs' declaratory relief and breach of contract claims fail as a matter of law because Aegis is not a Nursing Home as that term is defined in the policy.[44] Transamerica does not dispute that the policy's Nursing Home coverage pays for "all levels of care," including "qualifying stays and care" for Alzheimer's disease; it notes, however, that the "care or services must be provided in a Nursing Home."[45] As noted, a Nursing Home is defined as:

"A facility, or that part of one, which: (1) is operating under a license issued by the appropriate licensing agency: (2) is engaged in providing, in addition to room and board accommodations, nursing care and related services on a continuing inpatient basis to 6 or more individuals; (3) provides, on a formal prearranged basis, a Nurse who is on duty or on call at all times; (4) has a planned program of policies and procedures developed with the advice of, and periodically reviewed by, at least one Physician; and (5) maintains a clinical record of each patient. It may be a distinct part of a hospital or other institution." [46]

### 1. Interpretation of "Engaged in Providing Nursing Care and Related Services on a Continuing Inpatient Basis"

Transamerica asserts that Aegis is not a Nursing Home as that term is defined in the policy because it is neither licensed to nor is "engaged in providing nursing care and related services on a continuing inpatient basis." [47] It cites Aegis' answer to question five of the CareScout questionnaire, which asked how many beds are Aegis are "available for nursing care on a continuing inpatient basis" and how many inpatients were "currently receiving nursing care on a continuing inpatient basis." [48] Aegis' response to both questions was "0." [49] Transamerica also cites Gutowitz's agreement with Aegis, which states that Aegis will provide room, board, housekeeping, and "personal assistance and care on an as needed basis"; the contract expressly states that "nursing services" are an "excluded health-related service," which "Aegis shall not be responsible for furnishing or paying for." [50] Finally, Aegis stated on the CareScout questionnaire that it was not "engaged in providing nursing care on

---

44. Motion at 11.

45. Policy at 12.

46. Policy at 10.

47. *Id.*

48. Questionnaire Responses at 2.

49. *Id.*

50. Aegis Agreement at 4.

a continuing inpatient basis," and did not "provide 24 hour a day nursing service." [51] Based on this evidence, Transamerica asserts that Aegis does not meet the second prong of the Nursing Home definition because it does not provide "care and related services on a continuing inpatient basis to 6 or more individuals."

Transamerica contends that the California legislature's definition of a nursing home confirms there is no coverage under the policy for the services provided by Aegis. The California Health & Safety Code defines a "nursing home" as either a "licensed skilled nursing facility or licensed intermediate care facility." CAL. HEALTH & SAFETY CODE §§ 605110, 1416.2. A "skilled nursing facility" is a "health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing on an extended basis." *Id.*, § 1250(c)(1). An "intermediate care facility" is a "health facility that provides inpatient care to ambulatory or non-ambulatory patients who have recurring need for skilled nursing supervision and need supportive care but who do not require the availability of continuous skilled nursing care." *Id.*, § 1250(d).

Transamerica asserts that RCFEs are readily distinguishable from nursing homes. A RCFE is "a housing arrangement chosen voluntarily by the resident, the resident's guardian, conservator or other responsible person; where 75 percent of the residents are sixty years of age or older and where varying levels of care and supervision are provided, as agreed to at time of admission or as determined necessary at subsequent times of reappraisal." 22 C.C.R. § 87101(r)(5). A RCFE cannot accept or retain a resident who "requires 24–hour, skilled nursing or intermediate care." 22 C.C.R. § 87455(c)(2). In addition, a RCFE is not

required to employ licensed nurses. 22 C.C.R. § 87411.

Citing these facts, Transamerica contends that the case is indistinguishable from *McDermott v. Life Investors Ins.*, No. CV 06–5344RBL, 2007 WL 3273496, *2 (W.D.Wash. Nov. 1, 2007). There, the court considered whether a Washington state "boarding home"—that state's equivalent of a RCFE—qualified as a Nursing Home. *Id.* The policy at issue defined a nursing home as any facility that "(1) [was] licensed by the state as a nursing home or an Alzheimer's Disease facility; ... (2)[was] engaged in providing, in addition to room and board accommodations, nursing care and related services on a continuing inpatient basis; ... (3) provide[d], on a formal prearranged basis, a Nurse who [was] on duty or on call at all times; ... (4) ha[d] a planned program of policies and procedures developed with the advice of, and periodically reviewed by, at least one Physician; and (5) maintain[ed] a clinical record of each patient." *Id.* The policy in *McDermott* differs from Transamerica's policy only in that it required that the facility at issue be licensed "as a nursing home or an Alzheimer's Disease facility." *Id.* Transamerica's policy merely requires that the facility be "operating under a license issued by the appropriate licensing agency."

The *McDermott* court noted that the boarding home at issue there was not licensed as a nursing home, and observed that Washington does not license Alzheimer's Disease facilities. *Id.* at *4. It concluded that a boarding home did not qualify as a nursing home because "[t]he policy definition for 'nursing home' benefits requires the facility, no matter its license designation, to provide continuous nursing care." *Id.* Under Washington law, it stated, the facility in question could not "meet

---

**51.** Questionnaire Responses at 3.

that requirement," because "a facility licensed as a 'boarding home' [could not] provide nursing care to its residents on a continuous inpatient basis." *Id.* The court thus found that it could not "fulfill the requirements of either a 'nursing home' or Alzheimer's Disease Facility as provided by the policy." *Id.*

Transamerica maintains that, like the boarding home in *McDermott*, a RCFE cannot accept or continue to house a resident who "requires 24–hour, skilled nursing or intermediate care." 22 C.C.R. § 87455(c)(2). Asserting that the policy requires that a facility be able to provide continuous skilled nursing care before its services are covered, it contends summary judgment must be entered in its favor on plaintiffs' declaratory relief and breach of contract claims.

Plaintiffs counter that the *McDermott* court misconstrued the relevant policy language, and that they need only show that Aegis provides nursing care on a continuing inpatient basis. They contend the record is clear that Aegis does so by having a nurse on duty or on call at all times. Sommer's deposition testimony corroborates that Aegis has a nurse on duty or on call at all times.[52] Plaintiffs cite *Pistorese v. Transamerica Life Ins. Co.*, No. CV12–1083Z, 2013 WL 4008828 (W.D.Wash. Aug. 2, 2013), in support of their interpretation of the policy. The Pistorese court construed the Transamerica policy at issue here in determining whether the services provided by an Aegis facility and a third party facility were covered. The parties' dispute in *Pistorese* focused on "the second element of the [p]olicy's 'nursing home' definition." *Id.* at *3. Pistorese argued that the word "continuing" modified the phrase "inpatient basis," and therefore that a facility satisfied the second element

of the definition if its residents received some nursing care during an "ongoing" or non-temporary stay at the facility. *Id.* Transamerica countered that the word "continuing" modified the entire clause, and consequently that the second element required that a facility provide "continuing nursing care." The court found that the policy "language describing the second element [was] unambiguous and support[ed] [Pistorese's] interpretation." *Id.* at *4. It stated:

> "Ms. Pistorese offers a straightforward interpretation that reads the adjective 'continuing' as modifying the phrase immediately following it ("inpatient basis"). As Ms. Pistorese urges, an average insurance buyer would reasonably interpret the clause as focusing on whether the residents in a facility are *continuing inpatients* who receive some nursing care. Transamerica responds that while the adjective 'continuing' may modify the word 'inpatient,' the more important point is that the entire prepositional phrase 'on a continuing inpatient basis' modifies the type of 'nursing care' that must be provided. Reading these two phrases together, Transamerica's interpretation construes the second element as requiring a covered facility to provide *continuing nursing care.* However, Transamerica cannot escape the fact that the Policy simply does not state that there must be 'continuing nursing care,' but rather dictates that nursing care must be provided 'on a continuing inpatient basis.' Transamerica's interpretation is strained, requiring 'continuing' to directly modify 'inpatient basis' and also indirectly modify 'nursing care.' In essence, Transamerica asks the Court to rewrite the Policy so that a covered facility must be 'engaged in providing

**52.** Sommer Depo. at 241:3–7 ("Does Aegis of Ventura—does this facility have a nurse who is on-call 24 hours a day? A. Yes. Q. Okay. And how do you know that? A. That's our protocol.").

... *continuing* nursing care and related services on a continuing inpatient basis.' However, 'it is elementary law, universally accepted, that the courts do not have the power, under the guise of interpretation, to rewrite contracts which the parties have deliberately made for themselves.'" *Id.* (emphasis original).

The court also noted that reading the second prong of the definition in conjunction with the third supported Pistorese's interpretation, as the third prong required that a nurse be "on duty *or on call* at all times." *Id.* The court reasoned that the policy's five-part definition of a nursing home required that the interpretation of "'nursing care ... on a continuing inpatient basis'" be "consistent with the availability of a nurse who is merely on call." *Id.* It concluded that the "average insurance buyer would not expect an on-call nurse to provide 'continuous nursing care,'" *id.* and noted that Transamerica clearly did not think on-call nurses provided such care, as it had "suggest[ed] in its brief[ ] that Aegis and [another facility] [could not] satisfy the second element because there [were] shifts in which a nurse [was] merely on call," *id.* As a result, the court found, Transamerica's interpretation would "eliminate the third element's 'on call' provision, and ... fail to 'give[ ] effect to each provision' of the [p]olicy." *Id.* Interpreting the [p]olicy 'as a whole' by reading the second and third elements of the nursing home definition together," it held that "the [p]olicy unambiguously [did] not require 'continuous nursing care.'" *Id.*

■ The court finds aspects of *Pistorese*'s analysis persuasive. Like Washington courts, California courts construe insurance language "in the context of th[e] instrument as a whole, and in the circumstances of th[e] case, ... [not] in the abstract." *La Jolla Beach & Tennis Club,* 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d

1048. California courts will not "adopt a strained or absurd interpretation" of a policy. *Id.* Applying these principles, the court concludes that the Nursing Home definition does not unambiguously require that a facility provide continuous nursing care. The *McDermott* court's construction of the second definitional prong rewrites the parties' agreement to require *continuous nursing services* as opposed to nursing services on a *continuing inpatient basis*; courts, however, "should be mindful not to rewrite the parties' agreement to include a concept they failed to enunciate at the time they accepted the terms of their agreement." See *Celador Int'l Ltd. v. Walt Disney Co.,* No. CV 04–3541 FMC, 2009 WL 10429760, *9 (C.D.Cal. Mar. 6, 2009) (citing *Edwards v. Comstock Insurance Co.,* 205 Cal.App.3d 1164, 1167–69, 252 Cal. Rptr. 807 (1988)).

Transamerica's interpretation of the second clause, which would require that a nurse be on duty at all times and not simply on call, renders the third prong's requirement that a nurse be "on duty *or on call* at all times" surplusage. See *ACL Technologies, Inc. v. Northbrook Prop. & Cas. Ins. Co.,* 17 Cal.App.4th 1773, 1785, 22 Cal.Rptr.2d 206 (1993) ("In California, however, contracts—even insurance contracts—are construed to avoid rendering terms surplusage"); *Shell Oil Co. v. Winterthur Swiss Ins. Co.,* 12 Cal.App.4th 715, 753, 15 Cal.Rptr.2d 815 (1993) ("The way we define words should not produce redundancy, but instead should give each word significance"). The court therefore declines to follow *McDermott.* Accord *Pistorese,* 2013 WL 4008828 at *6 ("Insofar as *McDermott* construed the second element as unambiguously requiring a facility to provide 'continuous nursing care,' this Court reaches a different interpretation. *McDermott* adopted the insurance company's interpretation without providing any analysis in the order, and stated that the

policy requires 'continuous nursing care.' In so doing, *McDermott* refashioned the actual language of the policy. As here, the policy actually stated that a facility must provide 'nursing care ... on a continuing inpatient basis' ").

Like the *Pistorese* court, the court concludes that "continuing" modifies "inpatient basis," and refers to the period during which nursing services must be provided. See *Pistorese*, 2013 WL 4008828 at *6 ("the Court holds that the contract term 'continuing' modifies the phrase 'inpatient basis' and relates to the *duration* for which services are provided"). There is a subtle distinction between "continuous"—the word Transamerica uses to describe the services that must be provided before coverage is triggered—and "continuing"—which is the modifier of "inpatient services" used in the policy. "Continuing" means "ongoing" or "sustained," while "continuous" means "without interruption or intervening time."[53] As respects the term "inpatient basis," an inpatient is generally understood as "a patient in a hospital or infirmary who receives lodging and food as well as treatment." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1167 (1976). That the traditional definition of an inpatient references hospitals and infirmaries is not controlling, however, as the policy covers nursing facilities that need only supply on call nursing services.

Although the court agrees with the *Pistorese* court to the extent it held that "continuing" modifies "inpatient basis," it disagrees to the extent the *Pistorese* court concluded that this meant only that the patients had to reside in the facility on a continuing basis. The entire prepositional phrase "continuing impatient basis" modifies "nursing and related services." Con-struing the policy as a whole, and reading the second and third prongs of the Nursing Home definition in combination, it would appear that the policy language requires that nursing and related services be provided in the facility on an ongoing basis to individuals residing at the facility.

Citing governmental regulations that apply to nursing homes and RCFEs, Transamerica contends that interpreting the language in this fashion compels the conclusion that the phrase requires that a facility provide continuous nursing services. It asserts that an RCFE cannot accept a resident who "requires 24–hour, skilled nursing or intermediate care." 22 C.C.R. § 87455(c)(2). The policy, however, does not require that a nursing home provide skilled nursing or intermediate care services on a continuous basis before coverage is triggered. The policy requires only that a "Nursing Home" offer "nursing care and related services on a continuing inpatient basis ... [and provide] on a formal prearranged basis, a [n]urse who is on duty or on call at all times." There is no reference to skilled nursing or intermediate care in the policy, and the court cannot "rewrite the parties' agreement to include" such requirements. See *Celador Int'l Ltd.*, 2009 WL 10429760 at *9. Transamerica effectively conceded at the hearing that "nursing care and related services" must be construed in a manner consistent with provision of an on call nurse. It argued nonetheless that the policy requires the provision of skilled nursing care. Specifically, it contends that the reference to an on call nurse is taken directly from Medicare regulations, which permit nursing homes to provide on call nursing care due to a shortage of skilled nurses, especially in rural areas. See 42

---

53. See https://www.google.com/search?q=continuing&ie=utf–8&oe=utf-8 (last visited Aug. 2, 2015) (continuing); MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/continuous (last visited Aug. 2, 2015).

C.F.R. § 483.30(c) ("Waiver of requirement to provide licensed nurses on a 24–hour basis. To the extent that a facility is unable to meet the requirements of paragraphs (a)(2) and (b)(1) of this section, a State may waive such requirements with respect to the facility if ... [t]he facility demonstrates to the satisfaction of the State that the facility has been unable, despite diligent efforts (including offering wages at the community prevailing rate for nursing facilities), to recruit appropriate personnel").

Transamerica asserts that Gutowitz's policy effectively incorporates Medicare requirements and California nursing home licensing requirements, such that only a facility that provides skilled or intermediate nursing services is a covered Nursing Home. The policy, however, makes no reference to either skilled or intermediate nursing services. Neither in its papers or at the hearing did Transamerica cite authority for the proposition that it is appropriate to incorporate regulations into the policy in this fashion. As an initial matter, the court "do[es] not think a layperson would perceive any [such requirement] in the policy." *Utah Prop. & Cas. Ins. etc. Assn. v. United Servs. Auto. Assn.*, 230 Cal.App.3d 1010, 1022, 281 Cal.Rptr. 917 (1991). "However, assuming for the sake of argument the policy term is ambiguous, ... it is hard to reconcile [Transamerica's argument] with the rule that ambiguities in an insurance contract must be construed in favor of the insured." *Id.* In *Utah Property*, the California Court of Appeal considered whether an insurance policy that provided uninsured motorist coverage, but included no time limitation, was none-

theless subject to the one-year limitations period set forth in Insurance Code § 11580.2(b)(2). *Id.* at 1013, 281 Cal.Rptr. 917. The court held that "an insurer may not deny coverage under an insolvency protection clause by asserting a statutory time limit which the insurer failed to write into its policy." *Id.* at 1025, 281 Cal.Rptr. 917. This is because an "insurer may contract with its insured to provide *greater* ... protection than [a] statute requires." *Id.* at 1013, 281 Cal.Rptr. 917.

Here, as in *Utah Property*, Transamerica cannot assert that the policy requires skilled or intermediate nursing by citing Medicare or California regulations when it failed to write those regulations and their requirements into its policy. While Insurance Code § 533 is incorporated into insurance policies written in the state of California,[54] this is because it reflects a fundamental public policy of the state—one that is not applicable here. The court has located no authority "requiring a lay person in the position of the insured to read into a policy [any other] statutory provision that would put more restrictive limits on coverage than those stated in a policy." *Clarendon Nat. Ins. Co. v. Ins. Co. of the W.*, 442 F.Supp.2d 914, 931 (E.D.Cal.2006), aff'd sub nom. *Clarendon Nat. Ins. Co. v. H & G Transp., Inc.*, 290 Fed.Appx. 62 (9th Cir. Aug. 11, 2008) (Unpub.Disp.). "Such a position would be contrary to established principles that a policy should be interpreted in light of the expectations of a reasonable insured person, not a reasonable attorney or insurance expert, and not necessarily one with knowledge of subtle legal distinctions." *Id.* See also *Crane v. State Farm Fire &*

---

54. Section 533 provides that "[a]n insurer is not liable for a loss caused by the wilful act of the insured...." CAL. INS. CODE § 533. The purpose of § 533 is to discourage willful torts. *J.C. Penney Casualty Ins. Co. v. M.K.*, 52 Cal.3d 1009, 1021, 278 Cal.Rptr. 64, 804 P.2d 689 (1991). "Because § 533 reflects funda-

mental public policy, parties to an insurance policy cannot contract out from under its terms." *Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F.Supp. 597, 608 (N.D.Cal.1994) (citing *J.C. Penney*, 52 Cal.3d at 1019 n. 8, 278 Cal.Rptr. 64, 804 P.2d 689).

*Cas. Co.*, 5 Cal.3d 112, 115, 95 Cal.Rptr. 513, 485 P.2d 1129, (1971) ("The policy should be read as a layman would read it and not as it might be analyzed by an attorney or an insurance expert").

This is especially true given that the term "nursing care and related services" is not defined in the policy, and must be given its plain and ordinary meaning as a result. See *E.M.M.I. Inc. v. Zurich Am. Ins. Co.*, 32 Cal.4th 465, 471–72, 9 Cal. Rptr.3d 701, 84 P.3d 385 (2004) ("The policy at issue in this case defines certain words, such as 'we' and 'us' and further provides that '[o]ther words and phrases that appear in quotation marks have special meaning.' Neither the phrase 'actually in or upon' nor the term 'upon' is enclosed in quotation marks. Thus, nothing in the policy indicates or suggests that the exception to the vehicle theft exclusion is to be construed in a specialized or technical manner, or as Zurich contends—as used in statutes and ordinances"). Thus, "[a]bsent evidence that the parties intended the provision to have a specialized meaning, [the court] must reject [Transamerica's] contention and construe the term in question as would a layperson." *Id.* See also *Fire Ins. Exch. v. Superior Court*, 116 Cal.App.4th 446, 466, 10 Cal. Rptr.3d 617 (2004) (if there is ambiguity, it is the insurers' "burden to establish that their interpretation is the only reasonable one").

Here, particularly in light of the fact that the policy's definition of a Nursing Home permits use of an on call nurse to provide nursing services, the court concludes that a reasonable insured would have interpreted the policy as covering a facility that employed an on duty or on call nurse to provide nursing services in the facility on a ongoing basis to persons residing there. Moreover, California's RCFE regulations "do not, as a matter of law, prohibit Aegis [ ] from providing 'nursing

care and related services on a continuing inpatient basis.' The regulations expressly authorize [RCFEs] to provide a range of nursing care to residents, provided that the residents do not require other nursing services [ (i.e., 24–hour skilled nursing or intermediate care) ] that fall within the exclusive purview of licensed nursing homes." *Pistorese*, 2013 WL 4008828 at *5. California's licensing regime in fact *requires* that RCFEs "arrange, or assist in arranging, [ ] medical and dental care appropriate to the conditions and needs of residents." 22 C.C.R. § 87465(a)(1). The regulations state that "[w]hen residents require prosthetic devices, vision and hearing aids, the staff shall be familiar with the use of these devices, and shall assist such persons with their utilization as needed," and that RCFE staff must "assist residents with self-administered medications as needed." *Id.*, § 87465(a)(4)-(5). Although these services are not as comprehensive as the care one might receive at a licensed nursing home—i.e., they are not skilled nursing services—it appears clear that RCFEs can provide nursing care and related services on a continuing inpatient basis, albeit a more limited basis than a licensed nursing home.

In sum, if Transamerica had intended that the policy cover only licensed nursing homes providing skilled nursing services as those terms are defined by California law, it could easily have drafted policy provisions containing these limitations. Because it did not, it cannot now seek to incorporate California regulations in the policy so as to rewrite its plain language in a way that is contrary to the reasonable expectations of the insured. *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048 ("Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists"); *Baker*, 180 Cal. App.4th at 1328, 103 Cal.Rptr.3d 565 (even when a court concludes that policy lan-

guage is ambiguous, coverage under the policy must be "consistent with the insured's objectively reasonable expectations," based on "the policy as a whole" and the circumstances of the case, taken together with a dose of common sense").[55]

Nor can Transamerica secure a finding of no coverage by citing the portion of the policy definition stating that a "Nursing Home" is not a "community living center." Transamerica does not explain why the Aegis facility is a "retirement home or community living center," a term that is not defined in the policy. As the Aegis facility meets all the requirements set forth in the policy for designation as a "Nursing Home," a type of facility that is distinguished from a "community living center," Transamerica's argument is unavailing. See *Bodell v. Walbrook Ins. Co.*, 119 F.3d 1411, 1413 (9th Cir.1997) ("Insurance policies are to be broadly construed to afford the greatest possible protection to the insured.").

■ In sum, the court finds that the policy language covers facilities that offer nursing services to residents at the facility on an ongoing basis, whether those services are provided by an on duty or on call

55. At the hearing, Transamerica argued that in addition to *McDermott*, certain other decisions supported its interpretation of the policy and the entry of summary judgment in its favor. None of the cases cited alters the court's conclusion. As a threshold matter, none of these cases was decided under California law. In addition, each is inapposite. *Gillogly v. Gen. Elec. Capital Assur. Co.*, 430 F.3d 1284, 1286 (10th Cir.2005), involved a policy requiring that a facility be "licensed by the appropriate licensing agency to engage primarily in providing nursing care and related services to inpatients." *Id.* The definition also stated: "NOTE: The above requirements are typically met by licensed skilled nursing facilities, comprehensive nursing care facilities and intermediate nursing care facilities as well as some specialized wards, wings and units of hospitals. Those requirements are generally NOT met by: rest homes; homes for the aged; sheltered living accommodations; residence homes; or similar living arrangements." *Id.* The court concluded that the facility in question was not licensed by the state of Oklahoma to engage primarily in providing nursing care and related services to inpatients. *Id.* at 1290–91. Unlike the policy at issue in *Gillogly*, Transamerica's policy does not require that the facility for which coverage is sought "primarily" provide nursing care or be licensed to do so. It requires only that the facility be operating under a license issued by the appropriate licensing agency and be engaged in providing nursing care and related services on a continuing inpatient basis to 6 or more individuals. *Gillogly* is thus not controlling. The same is true of *Milburn v. Life Investors Ins. Co. of Am.*, 511 F.3d 1285, 1289–91 (10th Cir.2008), and *Geary v. Life Investors Ins. Co. of Am.*, 508 F.Supp.2d 518, 523–25 (N.D.Tex.2007). Because both involved substantially the same policy language as *Gillogly*, i.e., that the facility be licensed to engage primarily in providing nursing care, they too do not control. *Milburn*, 511 F.3d at 1291 (under Oklahoma law, "an assisted living center may provide 'intermittent or unscheduled nursing care' but is not licensed to engage 'primarily in providing nursing care and related services to inpatients' as provided in the plaintiff's policy"); *Geary*, 508 F.Supp.2d at 523–25 (holding that an assisted living facility licensed to provide personal care was not licensed to engage primarily in providing nursing care).

Finally, *Crutchfield ex rel. Crutchfield v. Transamerica Occidental Life Ins. Co.*, 894 F.Supp.2d 971, 975 (W.D.Ky.2012), is inapposite because it did not analyze or decide the meaning of the second element of the Nursing Home definition. *Id.* ("The parties dispute whether [the facility] provides 'nursing care ... on a continuing inpatient basis' or 'maintains a clinical record of each patient' "). Rather, the court concluded that the policy did not provide coverage because the insured conceded that the facility lacked "planned procedures developed with the advice of, and periodically reviewed by, at least one Physician." *Id.* ("On this basis alone, [the facility] fails to meet the definition of a 'Nursing Home' contained in the Policy"). She also conceded that she was not covered under the "substantial compliance" provision because she did not seek pre-certification as required by the policy. *Id.*

nurse. It does not require "continuous nursing care," as Transamerica contends and *McDermott* held. Nor does it require skilled or intermediate nursing care. Employing this interpretation of the policy language, the court must next determine whether triable issues remain regarding the fact that Aegis provided nursing care or related services to at least six residents on a continuing inpatient basis.

**2. Whether Plaintiffs Have Adduced Evidence Raising Triable Issues Regarding the Fact That Aegis Provided Nursing Care to at Least Six Residents on a Continuing Inpatient Basis**

■ Transamerica argues that the policy only covers stays at a facility, i.e., a Nursing Home, where "nursing care" is "provided on a continuing inpatient basis" to "patients" who are "confined" in the facility and must be "discharged" before they leave.[56] To demonstrate that Aegis is not a "Nursing Home," it relies exclusively on Aegis' license, its responses to the CareScout questionnaire, and correspondence from Aegis and/or the parties, all of which purportedly "readily acknowledge" that Aegis is not a nursing home.[57] Aegis' license as a RCFE does not preclude it from qualifying as a "Nursing Home" under the policy, however, as the contract's plain language requires only that Aegis be "operating under a license issued by the appropriate licensing agency."[58] The policy does not require that Aegis be licensed as a nursing home. Compare *McDermott*, 2007 WL 3273496 at *2 (addressing a policy that defined a nursing home as any facility that "(1) [was] licensed by the state as a nursing home or an Alzheimer's Disease facility").[59]

While it is true that one of Aegis' responses to the CareScout questionnaire states that it does not "provide [residents with] nursing care and related services on a continuing inpatient basis," the questionnaire did not include the full definition of a Nursing Home found in Transamerica's policy. Aegis' respondent, Anitra Sommer, thus did not know that having a nurse on call could be one way of providing nursing care "on a continuing inpatient basis." Moreover, although Sommer stated that Aegis does not provide nursing case on a continuing inpatient basis, her responses to individual questions in the questionnaire, taken together, suggest that Aegis does in fact provide such care. Sommer stated that Aegis nurses provide "quite a bit of nursing care [ ] to some patients,"[60] that there is a "Nurse who is on duty or on call at all times,"[61] that the nurse arrives at the facility "immediately" when phoned during on-call hours,[62] and that there are a total of 94 beds at the

---

**56.** Motion at 16.

**57.** *Id.* at 17.

**58.** Policy at 10.

**59.** This conclusion is borne out by other aspects of the policy. For example, the policy defines a Home Health Care Agency as "[a]n entity which provides care and services at [the insured's] home or other residence; is primarily engaged in providing residential health care services under policies and procedures established by a group of professionals, including at least one Physician and one Nurse, and: (1) is licensed by state law as a Home Health Care Agency...." (Policy at 9.) The fact that Transamerica required that a Home Health Care Agency be licensed as such, as opposed merely to requiring that it be "appropriately licensed," demonstrates that it knew how to require specific types of licenses if it so desired. It follows that it did not intend to require that a Nursing Home be licensed as a nursing home.

**60.** Questionnaire Responses at 15.

**61.** *Id.* at 14.

**62.** *Id.*

facility.[63] Because the phrase "nursing care and related services on a continuing inpatient basis" must be interpreted to include the provision of a nurse on duty or on call at all times, the questionnaire responses are sufficiently ambiguous that they indicate not the absence of triable issues, but the existence thereof.[64]

Plaintiffs have also adduced other evidence raising triable issues of fact as to whether Aegis' services are covered. Cf. *Gould*, 2013 WL 68873 at *3 ("the undefined term 'nursing care' encompasses unskilled nursing care and skilled nursing care"). Sommer testified that during the day shift, Aegis has a registered nurse on duty; at all other times, such a nurse is on call.[65] As noted, RCFEs *must* arrange or assist in arranging "medical and dental care appropriate to the conditions and needs of residents," assist residents with "prosthetic devices, vision and hearing aids," and "assist residents with self-administered medications as needed." *Id.*, § 87465(a)(1), (4)-(5). Moreover, California requires that RCFEs, at a minimum, provide "[p]ersonal assistance and care as needed by the resident and as indicated in the pre-admission appraisal, with those ac-

tivities of daily living such as dressing, eating, bathing, and assistance with taking prescribed medications." *Id.*, § 87464(f)(3). The fact that Aegis is a licensed RCFE and has a registered nurse on duty or on call at all times thus suffices to raise triable issues of fact as to whether it provides nursing services. Accord *Pistorese*, 2013 WL 4008828 at *8 ("As to the provision of nursing care, both Aegis and Clare Bridge have consistently stated that they provide intermittent nursing services that include administration of medications, oversight of health care treatments, and other nursing care on an 'as needed' basis"); *Gould*, 2013 WL 68873 at *3.

At the hearing, Transamerica argued that Phelps testified that Aegis' on call nurse does not provide nursing care, but simply calls a home health service to have it provide such care. The court cannot identify any deposition testimony of this nature by Phelps that is in the record. Phelps stated that when an individual at the facility needs skilled nursing care, those services are provided by a home health care service. He did not say, however, that the Aegis on call nurse could not provide any type of nursing services.[66]

---

63. *Id.* at 11.

64. As courts construing this policy language have noted, "[t]he [p]olicy is governed by its actual definition of 'Nursing Home,' not by some other definition that could have been, but was not, selected.... Moreover, the meaning of the [p]olicy's actual language is for the [c]ourt to evaluate based on the rules set forth above, not Transamerica's[, the facility's, or the insured's] opinion"). See *Gould v. Transamerica Life Ins. Co.*, No. CV 11-0730 WS C, 2013 WL 68873, *5 (S.D.Ala. Jan. 3, 2013); *Pistorese*, 2013 WL 4008828 at *8 ("First, the Court notes that the responses to the questionnaires Transamerica sent to Aegis and Clare Bridge when evaluating the claims ha[ve] limited . value. Specifically, there is almost no value to the facilities' responses when asked whether they provided 'nursing care on a continuing inpatient basis. This is

because any response necessarily hinges upon the facilities' interpretation of the precise clause that this Court must resolve' "). For this reason, the questionnaire responses do not mandate the entry of summary judgment in Transamerica's favor.

65. Phelps Depo. at 135:14–18 ("Q. Do you provide licensed nursing coverage on the day shift? A. Yes. Q. Okay. A. But not guaranteed."); Sommer Depo. at 142:21–23 ("Now, is there typically one registered nurse on the day shift for those, all 79 folks that reside here? A. Yes."); *id.* at 241:3–7 ("Does Aegis of Ventura—does this facility have a nurse who is on-call 24 hours a day? A. Yes. Q. Okay. And how do you know that? A: That's our protocol.").

66. Phelps Depo. at 157:2–8 ("Q. Are there individuals at Aegis who have a need for

Phelps also said that nurses at Aegis were there to "make sure that physician's orders [we]re properly implemented."[67] He noted that Aegis "nurses may provide some specific services to avoid the cost of home health," such as insulin and injections, wound care, and first aid.[68] He also stated that Aegis "ha[d] to deal with" people who got infections while at the facility, a situation that was "not uncommon."[69] While none of the services Phelps described constitute skilled nursing services, they are nonetheless nursing services in the sense an ordinary layperson would define the term. Thus, Phelps' testimony too indicates that triable issues remain as to whether Aegis provides nursing care and related services on a continuing inpatient basis.

The final question therefore is whether Aegis provides such services to six residents on a continuing inpatient basis. Aegis' questionnaire responses indicated there were a total of 59 beds in the facility where Gutowitz resides, and another 35 beds in the memory loss section of the facility.[70] Assuming all residents, or even a small fraction, receive nursing care on an inpatient basis, this requirement would be satisfied. See *Pistorese*, 2013 WL 4008828 at *8 ("Pistorese successfully carries her burden of establishing that there is no dispute of material fact that Aegis and Clare Bridge provided nursing services to at least three continuing residents. Regarding the numerical requirement, Aegis and Clare Bridge submitted that they have 48 beds and 60 beds, respectively, which Transamerica has never challenged"). Because no evidence has been submitted by either party on this point, triable issues of fact remain as to whether Aegis meets this aspect of the policy definition of Nursing Home.

To the extent Transamerica argues that it cannot be found to have intended that the terms inpatient, inpatient care, and confinement extend to assisted living facilities, the argument is unavailing because none of these terms inherently excludes coverage for assisted living facilities. The court has already explained the meaning of inpatient as used in the policy. Confinement is a term that is not found in the Nursing Home definition. Transamerica cites a policy provision stating that payment of premiums will not be required after the insured has "been confined to a hospital and/or Nursing Home for at least 60 uninterrupted days," and that premiums will also be suspended if the insured is discharged and "within 30 days require[s] confinement" for the same reasons as the previous confinement.[71] It is unclear why Transamerica believes a patient who resides on a continuous basis at Aegis is not confined there, as the policy requires. Case law from other jurisdictions does not indicate that as used in an insurance policy, confinement refers exclusively to nursing homes; indeed, it appears Transamerica's own policies refer to confinement in assisted living facilities. See *Sherman v. Transamerica Life Ins. Co.*, 475 Fed.Appx. 733, 734 (11th Cir.2012) (Unpub.Disp.) ("On her application, Sherman expressly acknowledged that she was applying for home-care only coverage and that she understood that the 'coverage is designed to provide benefits for home health care services and does not provide

---

skilled nursing? I'm talking about this facility. A. Yes, home health. Q. Okay. So the people who have skilled nurses come in from home health agencies because they need skilled nursing? A. Yes.").

**67.** *Id.* at 149:7–9.

**68.** *Id.* at 75:16–22.

**69.** *Id.* at 38:24–39:3.

**70.** Questionnaire Responses at 1.

**71.** *Id.* at 17.

coverage for confinement in any nursing home or assisted living facility' "); *Sawyer v. Transamerica Life Ins. Co.*, No. CV 09–61288–HUCK, 2010 WL 1372447, *2 (S.D.Fla. Mar. 31, 2010) (noting that Transamerica policy required that the insured agree to the following: "I am applying for Home Care Only and understand this coverage is designed to provide benefits for home health care services and does not provide coverage for confinement in any nursing home or assisted living facility").[72]

Plaintiffs, in fact, proffer a Transamerica policy that uses the terms "inpatient," "inpatient care," and "confined" to describe coverage for residents in assisted living facilities.[73] Perhaps recognizing that it cannot respond adequately to this evidence, Transamerica does not mention it in its reply. As plaintiffs note, this later issued policy effectively refutes Transamerica's argument about what it meant by the language it chose to include in Gutowitz's policy. See *Progressive Choice Insurance Company v. California State Automobile Association Inter–Insurance Bureau*, 218 Cal.App.4th 1145, 1154, 160 Cal.Rptr.3d 662 (2013) ("We note that

when CSAA has wished to include the statutory exclusion provided by section 11580.2[ ], it has done so [citing other CSAA policies]").

Here, there is evidence stating that Gutowitz was "admitted" to Aegis in December 2013; it is undisputed that he has remained at the facility since that time.[74] Transamerica does not dispute that Aegis provides room and board for Gutowitz.[75] Consequently, Transamerica's argument based on the terms inpatient, inpatient care, and confinement fails.

For all of declaratory relief and breach of contract claims must therefore be denied.

### D. Whether Plaintiffs' Breach of the Covenant of Good Faith and Fair Dealing Claim Fails as a Matter of Law

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. This principle is applicable to policies of insurance." *Amadeo v. Principal*

---

**72.** At the hearing, Transamerica argued that the policies at issue in these cases are not California policies and thus are not relevant in assessing the meaning of terms in the policy issued to Gutowitz. The court finds this argument curious as *all* of the authority on which Transamerica relies concerns policies issued in other jurisdictions. More fundamentally, the pertinent question is whether these terms exclude assisted living centers such as Aegis. Given that Transamerica uses the term confinement in assisted living policies, the court cannot credit its argument that the term does not extend to such facilities. This is so whether or not the policy is a California policy or one issued in another state.

**73.** Berry Decl., Exh. 27 (Life Investors Insurance Company of America Policy) at 35 (defining an "Assisted Living Facility" as "[a]

facility which is licensed by the appropriate authority in the state in which it is located and which charges a fee to provide inpatient care for persons who are not in need of hospital or nursing home care but who are in need of assistance with Activities of Daily Living or are Cognitively Impaired, and which has [certain other attributes]"); *id.* ("A Day of Confinement is each day You are confined as an inpatient in an Assisted Living Facility under a Plan").

**74.** *Id.* (noting that Gutowitz was "admitted 12/13").

**75.** See generally Motion at 3 (parsing second prong of Nursing Home definition but failing to address the room and board requirement); *id.* at 4 ("residents lease apartments that contain private bathrooms, closets, refrigerators and doors that lock").

*Mut. Life Ins. Co.,* 290 F.3d 1152, 1158 (9th Cir.2002) (citing *Comunale v. Traders & General Ins. Co.,* 50 Cal.2d 654, 328 P.2d 198 (1958)). "The responsibility of the insurer to act in good faith 'is not the requirement mandated by the terms of the policy itself' but is imposed by law, breach of which sounds in tort notwithstanding that the denial of benefits may also constitute breach of the contract." *Id.* (citing *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973)). "In the context of an insurance policy, [t]he terms and conditions of the policy define the duties and performance to which the insured is entitled." *Kransco v. Am. Empire Surplus Lines Ins. Co.,* 23 Cal.4th 390, 400, 97 Cal.Rptr.2d 151, 2 P.3d 1 (2000) (citation and internal quotation marks omitted).

 Under California law, a breach of the implied covenant of good faith and fair dealing in the insurance context has two elements: "(1) benefits due under the policy must have been withheld and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Love v. Fire Ins. Exchange,* 221 Cal.App.3d 1136, 1151, 271 Cal.Rptr. 246 (1990). "The test for determining whether an insurer is liable for breach of the implied covenant turns on whether the insurer's alleged refusal or delay was unreasonable." *Nationwide Mut. Ins. Co. v. Ryan,* 36 F.Supp.3d 930, 941 (N.D.Cal.2014) (citing *Chateau Chamberay Homeowners v. Associated Int'l Ins. Co.,* 90 Cal.App.4th 335, 346, 108 Cal.Rptr.2d 776 (2001)). "[T]he precise nature and extent of the duty imposed by [the] implied promise will depend on the contractual purposes, and therefore if there is no potential for coverage under the policy, a claim for bad faith cannot be brought." *Amadeo,* 290 F.3d at 1158 (internal citation and quotation marks omitted).

 Transamerica first argues that it did not breach the policy, and hence plaintiffs' implied covenant claim fails. The court agrees that a breach of the implied covenant claim will not lie where the insurer did not breach the underlying insurance contract by denying coverage. See *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) ("It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer"). The court, however, has denied Transamerica's motion for summary judgment on plaintiffs' breach of contract and declaratory relief claims. Thus, the lack of a breach of contract does not provide a basis for entering summary judgment in Transamerica's favor on the implied covenant claim.

Transamerica argues alternatively that "[t]he mistaken withholding of policy benefits, if reasonable or based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability." *Tomaselli v. Transamerica Ins. Co.,* 25 Cal.App.4th 1269, 1280–81, 31 Cal.Rptr.2d 433 (1994). In other words, Transamerica argues that it conducted a reasonable investigation concerning coverage, and "there [was] a genuine issue as to the insurer's liability" under the policy. See *Lunsford v. Am. Guar. & Liab. Ins. Co.,* 18 F.3d 653, 656 (9th Cir. 1994). As a result, it contends, the "court can conclude as a matter of law that [its] denial of [the] claim [was] not unreasonable." *Id.*

The court cannot agree. "[T]he reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact." *Amadeo,* 290 F.3d at 1161. Although sum-

mary judgment is be proper in certain limited circumstances, the Ninth Circuit has cautioned that the "genuine issue rule in the context of bad faith claims allows a district court to grant summary judgment [only] when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law." *Id.* at 1161. "In such a case, because a bad faith claim can succeed only if the insurer's conduct was unreasonable, the insurer is entitled to judgment as a matter of law." *Id.* at 1161–62.

▮▮▮ On the other hand, "an insurer is not entitled to judgment as a matter of law where, [as here,] viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." *Id.* at 1162. In *Neal v. Farmers Ins. Exch.*, 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980 (1978), for example, the California Supreme Court affirmed a jury's finding of bad faith even though the evidence concerning its motives and conduct was conflicting. *Id.* at 921, 148 Cal.Rptr. 389, 582 P.2d 980. "[S]ome of [the] evidence was to the effect that [the insurer] did no more here than assert its legal position reasonably and in good faith." *Id.* There was other evidence, however, of "undeniable substantiality . . . that Farmers knew at an early date . . . that it had no colorable defense to plaintiff's claim." *Id.*

▮▮▮ "In this case, there is sufficient evidence in the record from which a jury could conclude that [Transamerica] denied [plaintiffs'] claim unreasonably and in bad faith." *Amadeo*, 290 F.3d at 1162. Transamerica contends this is not the case because there was a split of authority concerning proper interpretation of the policy language at issue. That the *McDermott* and *Pistorese* courts reached different con-

clusions respecting the second prong of the definition of Nursing Home in the policy, however, is not sufficient to warrant the entry of summary judgment in Transamerica's favor on the implied covenant claim. This is especially true when, in addition to the *Pistorese* court, the *Gould* court rejected Transamerica's narrow interpretation of the second prong of the Nursing Home definition in the policy. See *Gould*, 2013 WL 68873 at *5 ("The Court offers a word of clarification before leaving this portion of the Policy definition. Transamerica appears frustrated that Cedar Hill, and ALFs generally, do not comport with modern conceptions of a nursing home or with Alabama regulatory definitions and descriptions of such entities. . . . This is not how insurance law works. The Policy is governed by its actual definition of 'Nursing Home,' not by some other definition that could have been, but was not, selected, and this is true even though developments in elder care since 1992 (and especially the advent of ALFs) may have rendered quaint or even ill-advised its chosen definition").

At the hearing, Transamerica argued that courts outside California had construed the language in a manner consistent with its arguments in this case. As the court noted *supra*, however, each decision Transamerica cited is inapposite. See *Gillogly*, 430 F.3d at 1286 (requiring that a facility be licensed to "engage *primarily* in providing nursing care and related services to inpatients" (emphasis added)); *Milburn*, 511 F.3d at 1289–91 (same); *Geary*, 508 F.Supp.2d at 523–25 (same); see also *Crutchfield*, 894 F.Supp.2d at 975 (finding fourth prong of Nursing Home definition not satisfied).

▮▮▮ "Under California law, a reasonable interpretation of an insurance contract accords 'the meaning a layperson would ordinarily attach to it,' and construes ambiguous provisions in favor of

coverage to protect the 'objectively reasonable expectations of the insured.'" *Amadeo,* 290 F.3d at 1162; *Neal,* 21 Cal.3d at 922 n. 5, 148 Cal.Rptr. 389, 582 P.2d 980 ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"). Based on the present record, the court cannot conclude as a matter of law that Transamerica discharged its duty to interpret the policy reasonably.

At the hearing, Transamerica argued that its denial letters are evidence that it acted reasonably. There are two denial letters authored by Transamerica in the record. The first is dated December 26, 2013. It is one page long. It lists the definition of a Nursing Home and states: "[B]ased on the information currently available to us concerning Aegis of Ventura, it appears that Aegis of Ventura does not satisfy the policy's eligibility criteria." [76] This terse letter, which does not substantively explain why Transamerica reached the conclusion communicated, does not demonstrate the absence of triable issues concerning plaintiffs' good faith claim. The second letter, which is dated March 18, 2014, contains a more detailed discussion of the basis for denial; this discussion focuses on the second element of the Nursing Home definition. The reasoning Transamerica communicated was essentially the same as the basis upon which it sought summary judgment on the breach of contract claim—i.e., RCFEs do not, and cannot, provide 24–hour skilled nursing or intermediate care.[77] Because, as noted, this construction does no "accord[ to the term nursing care and related services] 'the meaning a layperson would ordinarily attach to it,' and [because it fails to] construe[ ] ambiguous provisions in favor of coverage," triable issues of fact re-

main as to whether Transamerica's interpretation of the policy was reasonable. This precludes the entry of summary judgment in its favor on the breach of implied covenant claim. *Amadeo,* 290 F.3d at 1162.

Thus, this case is not like *Lunsford,* where the Ninth Circuit "applied the genuine issue rule to affirm a grant of summary judgment because the insurer adopted '*a reasonable construction of the policy*' in the context of unsettled law and it was not disputed that the insurer conducted an adequate investigation of the claim." 18 F.3d at 656 (emphasis added). Here, as in *Amadeo,* a jury may well find that "[t]hose conditions are not present." 290 F.3d at 1162. The court cannot conclude that Transamerica's interpretation of the contract, which rewrites and engrafts California nursing home regulations onto the policy, was reasonable as a matter of law. Most certainly, this is not a case "where even under the plaintiff[s'] version of the facts there is a genuine issue as to the insurer's liability under California law." *Amadeo,* 290 F.3d at 1161. Rather, viewing the facts in the light most favorable to plaintiffs, the court concludes that triable issues remain as to whether Transamerica's interpretation of the policy was reasonable. A jury could find that, regardless of its investigation, Transamerica unreasonably ignored case law that more thoroughly analyzed the policy language than did *McDermott* to interpret the policy in a way that would permit it to deny coverage to Gutowitz. Transamerica's motion for summary judgment on the implied covenant claim must therefore be denied. See *Hat v. Depositors Ins. Co.,* 339 Fed. Appx. 764, 765 (9th Cir.2009) (Unpub.Disp.); ("An insurer is not entitled to summary judgment where a jury could reasonably conclude that the insurer acted

---

**76.** Walker Decl., Exh. 40 (Denial Letter dated 12/26/2013).

**77.** *Id.,* Exh. 46 (Denial Letter dated 3/18/14).

unreasonably"); *Amadeo,* 290 F.3d at 1161 (reversing the entry of summary judgment in an insurer's favor on a bad faith claim because "Principal's interpretation was sufficiently arbitrary and unreasonable that a jury could find it was adopted by Principal in bad faith"); *A–1 Transmission Auto. Tech., Inc. v. AMCO Ins. Co.,* No. CV 10 8496 RSWL (SSx), 2012 WL 1534466, *4 (C.D.Cal. Apr. 27, 2012) ("the genuine dispute rule only allows a district court to grant summary judgment on bad faith claims where it is undisputed that the basis for the insurer's decision was reasonable").[78]

### E. Whether Plaintiffs Can Recover Punitive Damages

Transamerica next argues that it is entitled to summary judgment on plaintiffs' punitive damages prayer. It contends plaintiffs have adduced no evidence that would support a finding of fraud, oppression, or malice as required by California law.

■■■■ "Because an action for bad faith sounds in tort, the general rules of tort damages apply." *Amadeo,* 290 F.3d at 1164. Punitive damages are available "if in addition to proving a breach of the implied covenant of good faith and fair dealing proximately causing actual damages, the insured proves by clear and convincing evidence that the insurance company itself engaged in conduct that is oppressive, fraudulent, or malicious." *PPG Indus. v. Transamerica Ins. Co.,* 20 Cal.4th 310, 318, 84 Cal.Rptr.2d 455, 975 P.2d 652 (1999); see also *Neal,* 21 Cal.3d

---

**78.** Plaintiffs argue in their opposition that Transamerica's failure to pre-certify the facility as substantially compliant with the policy definition of a Nursing Home evidences bad faith. Plaintiffs did not plead this theory of bad faith in their complaint. The breach of the implied covenant claim does not reference pre-certification of the facility as substantially compliant; it alleges only that Transamerica's interpretation of the policy language violated Gutowitz's reasonable expectations and was unreasonable as a matter of contract construction. (Complaint, ¶¶ 53–54.) As a result, plaintiffs cannot raise the theory for the first time in their opposition to create a triable issue of fact. See *Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1080 (9th Cir. 2008) ("Nevertheless, our precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court," citing *Wasco Prods., Inc. v. Southwall Techs., Inc.,* 435 F.3d 989, 992 (9th Cir.2006) (" 'Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings' ")).

Plaintiffs disputed this at the hearing. They argued that *Navajo* does not apply where the complaint states a viable claim on one theory, even if it does not mention another. Stated differently, they argued that *Navajo* simply requires that a plaintiff state *a claim* on which relief can be granted; if he does so, they assert, the plaintiff can later advance any theory germane to that claim. This is not correct. The Ninth Circuit's decision in *Pickern v. Pier 1 Imports (U.S.), Inc.,* 457 F.3d 963, 968–69 (9th Cir.2006), forecloses such an argument. There, the Ninth Circuit held that a where a complaint "gave the [defendants] no notice of the specific factual allegations presented for the first time in [plaintiff's] opposition to summary judgment," the new theory could not be used to raise triable issues of fact. *Id.* Here, the operative complaint makes no mention of pre-certification. Plaintiffs therefore cannot raise the issue for the first time in opposition to Transamerica's summary judgment motion to create triable issues.

Plaintiffs also request that the court "sustain" the implied covenant claim under Rule 56(d)(1). That rule provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may … defer considering the motion or deny it." Fed.R.Civ.Proc. 56(d)(1). Because the court concludes that triable issues remain based on the present record, deferral is unnecessary.

at 922, 148 Cal.Rptr. 389, 582 P.2d 980 ("As we have pointed out above, there was substantial evidence before the jury to support a finding that defendant had breached its duty to deal reasonably and in good faith with its insured, rendering Farmers liable to pay compensatory damages for all detriment proximately caused by that breach. However, ... such a determination does not in itself establish that defendant acted with the quality of intent that is requisite to an award of punitive damages. For this we must look further beyond the matter of reasonable response to that of motive and intent").

■ In *Egan v. Mut. of Omaha Ins. Co.*, 24 Cal.3d 809, 820, 169 Cal.Rptr. 691, 620 P.2d 141 (1979), the California Supreme Court recognized that "[t]he availability of punitive damages is [ ] compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship." These considerations are particularly acute in life insurance cases where "[t]he very risks insured against presuppose that if and when a claim is made, the insured will be ... particularly vulnerable to oppressive tactics on the part of an economically powerful entity." *Fletcher v. W. Nat'l Life Ins. Co.*, 10 Cal. App.3d 376, 403, 89 Cal.Rptr. 78 (1970). "Punitive damages are therefore made available 'to discourage the perpetuation of objectionable corporate policies' that breach the public's trust and sacrifice the interests of the vulnerable for commercial gain." *Amadeo*, 290 F.3d at 1164–65 (quoting *Egan*, 24 Cal.3d at 819, 169 Cal. Rptr. 691, 620 P.2d 141). "Consistent with this goal, a plaintiff may meet the state of mind requirement for an award of punitive damages by showing that the insurer's bad faith was 'part of a conscious course of conduct, firmly grounded in established company policy.' " *Id.*

■ "Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury." *Id.* (citing *Egan*, 24 Cal.3d at 819, 169 Cal.Rptr. 691, 620 P.2d 141). In this case, however, there is no evidence that Transamerica's bad faith actions "were part of a conscious course of conduct, firmly grounded in established company policy." *Neal*, 21 Cal.3d at 923, 148 Cal.Rptr. 389, 582 P.2d 980. While triable issues remain as to whether Transamerica is liable for breach of the covenant of good faith implied in the insurance contract, this does not alone prove an entitlement to punitive damages. Only "if in addition to proving a breach of the implied covenant of good faith and fair dealing proximately causing actual damages, the insured [also] proves by clear and convincing evidence that the insurance company itself engaged in conduct that is oppressive, fraudulent, or malicious," are punitive damages warranted. *PPG Indus.*, 20 Cal.4th at 318, 84 Cal. Rptr.2d 455, 975 P.2d 652; *Neal*, 21 Cal.3d at 922, 148 Cal.Rptr. 389, 582 P.2d 980 ("a determination [of bad faith] does not in itself establish that defendant acted with the quality of intent that is requisite to an award of punitive damages. For this we must look further beyond the matter of reasonable response to that of motive and intent"). Plaintiffs have cited no evidence warranting the imposition of punitive damages, let alone clear and convincing evidence that Transamerica denied their claim maliciously, oppressively or fraudulently. Plaintiffs, in fact, do not cite any record evidence at all. Because the court need not "scour the record in search of a genuine issue of triable fact," this alone warrants granting Transamerica's motion for summary judgment on plaintiffs' punitive damages prayer. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996). See also *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir.2001) (holding

that the district court "need not examine the entire file for evidence establishing [the absence of] a genuine issue of fact, where the evidence is not set forth in the [moving] papers with adequate references so that it could conveniently be found"); *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir.1994) (" '[J]udges are not like pigs, hunting for truffles buried in briefs,' " quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) (per curiam)); *Grigoryan v. Experian Info. Solutions, Inc.*, 84 F.Supp.3d 1044, 1062, 2014 WL 7745883, *10 (C.D.Cal.2014) (movant's failure to cite the location of evidence in the record was a sufficient basis to deny a summary judgment motion).

In fact, plaintiffs do not even respond to Transamerica's arguments in support of summary judgment on the issue of punitive damages. Thus, the issue must also be deemed abandoned. See *Pinson v. U.S. Dep't of Justice*, 61 F.Supp.3d 164, 185 (D.D.C.2015) ("As this Court has explained, 'when a party responds to some but not all arguments raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded.' The Court therefore deems conceded the DOJ's motion for summary judgment as to these six requests"); *Mignault v. Ledyard Pub. Sch.*, 792 F.Supp.2d 289, 303 (D.Conn.2011) ("In their motions for summary judgment, the Defendants argue that to the extent the Plaintiff is alleging a conspiracy claim, that claim fails as a matter of law. The Plaintiff failed to respond to this argument in his brief in opposition to the Defendants' motions for summary judgment.... Therefore, these claims will be dismissed as abandoned"); *Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon*, No. 07–cv–1445 (WWE), 2010 WL 2596927, *6 (D.Conn. June 24, 2010) (same); *Sykes v. Dudas*, 573 F.Supp.2d 191, 202 (D.D.C.2008) (same). Accordingly, summary judgment must to

granted in Transamerica's favor on plaintiffs' punitive damages prayer.

## III. CONCLUSION

For the reasons stated, Transamerica's motion for summary judgment is granted in part and denied in part. The court grants Transamerica's motion for summary judgment on Gutowitz's prayer for punitive damages. It denies the motion as to the balance of the claims.